STATE, RESPONDENT, *v.* CALDER, APPELLANT.

[No. 1,431.]

[Submitted January 3, 1900. Decided January 29, 1900.]

*Criminal Law—Homicide—Information—Indorsement of the Names of Witnesses—Evidence—Corpus Delicti—Testimony of Accomplice—Sufficiency of Corroboration—Instructions— Degrees of Murder—Circumstantial Evidence.*

1. Under Penal Code of 1895, Sec. 1734, requiring the county attorney to indorse on the information, at the time of its filing, the names of the witnesses then known to him, where the name of a witness known to the county attorney at the filing of the information was omitted, but there was no evidence of bad faith, the court properly permitted it to be indorsed on the day before trial.

2. On a trial for murder, the identity of the person alleged to have been killed was proved by direct evidence of an accomplice, who was an eyewitness, and assisted in disposing of the body by burning it and throwing the ashes in a river, corroborated by circumstantial evidence. The death of a human being was directly proved, by the identification of certain teeth and charred bones found in a river near the point

where the body was burned, and there was circumstantial evidence to prove the identity of the deceased. *Held,* that the evidence was sufficient to satisfy the requirements of Penal Code, Sec. 358, that the "death" of the person alleged to have been killed must be established by "direct proof," as an independent fact, and of Code of Civil Procedure, Sec. 3108, defining "direct proof" as that which proves the fact in dispute, without an inference or presumption.

3. In prosecutions for murder, proof of the *corpus delicti* involves the establishment of the fact that a murder has been committed, but includes neither the identity of the person alleged to have been killed, nor the killing by the person accused.

4. Under Penal Code, Sec. 2089, requiring an accomplice to be corroborated by other evidence which of itself tends to connect the defendant with the crime, it is not essential that the evidence in corroboration must be sufficient, when standing alone, to connect the defendant with the crime, but it is sufficient if it tends so to do.

5. The court is not bound to charge upon murder in the second degree, or upon a lower grade of homicide, when there is no evidence, direct or circumstantial, to which the instruction could apply.

6. On a trial for murder, the refusal to charge specifically as to the burden of proof resting on the state to establish beyond reasonable doubt the existence of each link in the chain of circumstantial evidence was not error, where there was direct evidence of the main fact, and the indirect evidence was merely in corroboration.

*Appeal from District Court, Fergus County; Dudley Du Bose, Judge.*

WILLIAM WALLACE CALDER was convicted of murder. From an order denying a new trial he appeals. Affirmed.

*Mr. Wm. E. Cort* and *Mr. O. F. Goddard,* for Appellant.

*Mr. C. B. Nolan,* Attorney General, for the State.

**MR. JUSTICE PIGOTT** delivered the opinion of the Court.

William Wallace Calder was tried upon an information charging him with the murder of one Farquhar MacRae on the 24th day of September, 1898, at the county of Fergus. The jury having found him guilty of murder in the first degree, as charged, he was sentenced to be hanged. Upon the 25th day of May, 1899, his motion for a new trial was denied, and he appeals.

1. The first specification of error is directed to the action of the district court in permitting the county attorney, on the day next before the beginning of the trial, to indorse upon the information the name of one James Calder, an important witness for the state. To the request for leave to indorse the name of this witness, the defendant objected, but the objec-

tion was overruled, and the name indorsed, the defendant excepting. At the common law the names of the witnesses are not required to appear upon the indictment or information. It is only by virtue of the statutes that such necessity exists. Section 1813 of the Penal Code provides that the names of the witnesses examined before the grand jury must be inserted at the foot of the indictment, or indorsed thereon, before the indictment is presented to the court, but that a motion to set it aside, interposed under Section 1910 of the Penal Code, shall be denied if the names be indorsed prior to the disposition of the motion. Under the statute as it existed from 1891 to July 1, 1895, the prosecuting attorney was commanded to indorse upon the information, at the time of its filing, the names of the witnesses then known to him, "and at such time before the trial of any case, as the court may, by rule or otherwise, prescribe, he shall also indorse thereon the names of such other witnesses as shall then be known to him. (Laws of 1891, p. 250, Sec. 3.) Section 1734 of the Penal Code of 1895, which is the law applicable to the present case, differs from the statute of 1891 only in this, that Section 1734 omits the provision contained in the former statute requiring the names of witnesses discovered after the filing to be indorsed upon the information, and, of course, necessity does not now exist for the indorsement of the names of witnesses discovered subsequently to the filing; but the requirement that the names of witnesses for the state then known to the attorney prosecuting must be indorsed upon the information at the time it is filed is common to both. It is manifest, therefore, that neither by the statute of 1891 nor by Section 1734 is there expressly given to or recognized in the court the privilege of permitting the names of witnesses known when the information was filed to be indorsed thereafter. In *State* v. *Black*, 15 Mont., at pages 151 and 152, 38 Pac. 676, 677,—decided under the statute of 1891,—it was held, in substance, that the trial court did not err in permitting the name of such witness to be indorsed at the opening of the trial. This rule we affirm, and apply to the

case at bar.    The purpose sought to be accomplished by Section 1734 is apparent.    It is to advise the defendant of the witnesses known at the time the information is filed,—and these are usually the most important,—whom the state intends to call against him, so that he may have opportunity to make inquiries in respect of the witnesses, and otherwise prepare himself for meeting their testimony.    If the witnesses are then known to the county attorney, his duty is to indorse their names at the time the information is filed; such is the command addressed by the statute to that officer, but it does not attempt to limit the exercise of the court's discretion, or define the duty of the court.    The contention of the defendant is that if the county attorney, even by inadvertence or mistake, omits from the information, when filed, the name of a witness then known to him, the name never can properly be indorsed, and the state must be deprived of the testimony which the witness would give had his name been indorsed. The contention is untenable, for the· court may permit the indorsement to be made after the information is filed, as was held in *State* v. *Black, supra.*    In the case at bar the objection to the granting of the leave asked was general, no ground being stated in its support; the transcript fails to disclose that a showing was made at the time that James Calder was known to be a material witness when the information was filed, although the witness, when testifying thereafter, incidentally stated that he had imparted to the county attorney the facts touching the defendant's connection with the murder.    But, for aught that appeared when the objection was interposed, the witness was not known to the county attorney at the time the information was filed, and for this reason the objection was properly overruled.    Every reasonable intendment is in favor of the action of the trial court; the burden of establishing error is upon him who assails the ruling; and, since the court might with propriety permit the indorsement to be made after the filing, the presumption is conclusive, in the absence of proof to the contrary, that its action was correct. It is argued that the uncontradicted assertion of the witness

made during the trial ought to have been accepted by the court as proof of such knowledge by the county attorney; but, conceding this, either of two answers is sufficient: First, the proof should have been adduced at the time of the objection; secondly, no effort was made to show that the name of the witness had been purposely withheld from the information. We express no opinion in respect to the right course for the court to take where it appears that the omission of the indorsement at the time of filing was in bad. faith; but we do hold that in all other cases the court should permit the indorsement upon the information of the names of witnesses who were known to the county attorney at the time it was filed, and in such cases the defendant would be entitled, upon timely application and showing, to a reasonable delay of the hearing to enable him to meet the testimony of the witnesses whose names were put upon the information after it had been filed. In the present case, however, no application or showing whatever was made. These views are, in part, at least, supported inferentially or directly by *State* v. *Cook,* 30 Kan. 82, 1 Pac. 32; *State* v. *Bokien,* 14 Wash. 411, 44 Pac. 880; and *State* v. *Black, supra.* The first specification is without merit.

2. The principal points made by the defendant are that the death of MacRae was not sufficiently proved by direct evidence, and that the evidence, aside from the testimony of the accomplice, did not tend to connect the defendant with the commission of the offense. He insists there was no evidence which, without the aid of the testimony of the accomplice, tended to prove guilt. It is argued that the *corpus delicti* was not established, and that the evidence in corroboration of the accomplice was not of such character and force as to warrant the submission of the case to the jury.

Section 3108 of the Code of Civil Procedure defines "direct evidence" as "that which proves the fact in dispute directly, without an inference or presumption, and which in itself, if true, conclusively establishes that fact. For example, if the fact in dispute be an agreement, the evidence of a witness

who was present and witnessed the making of it, is direct."
Section 358 of the Penal Code provides that "no person can
be convicted of murder or manslaughter unless the death of
the person alleged to have been killed, and the fact of the
killing by the defendant as alleged, are established as inde-
pendent facts; the former by direct proof and the latter be-
yond a reasonable doubt." Section 2089 of the Penal Code
is as follows: "A conviction cannot be had on the testimony
of an accomplice, unless he is corroborated by other evidence,
which in itself, and without the aid of the testimony of the
accomplice, tends to connect the defendant with the commis-
sion of the offense; and the corroboration is not sufficient, if
it merely shows the commission of the offense, or the circum-
stances thereof."

We assume, as did the attorney general in his brief and
argument, that James Calder was unquestionably a confeder-
ate of the defendant in committing the murder of which the
latter was accused. James Calder, a brother to the defend-
ant, and an accomplice in the crime of which the defendant
was convicted, was the principal witness for the state. His
story is, in brief, the following: The defendant, aged 25,
and the witness, aged 19, lived with their mother and step-
father, Smith, on Flatwillow creek, in Fergus county, about
16 miles from the Musselshell river. One James Eli Fisher,
aged 21 or 22, was visiting the brothers. MacRae was a
ranchman and had a flock of about 1,700 sheep, one-half of
which belonged to one Hildebrand. In the employ of Mac-
Rae was a sheep herder named Allen. MacRae and Allen oc-
cupied a cabin distant 1½ or 2 miles from the home of the de-
fendant. The country thereabouts is sparsely populated,
there being but four families in a radius of as many miles,
and is but little traveled. On the afternoon of Saturday,
September 24, 1898, the brothers and Fisher, armed with
two guns, went hunting. After they had gone about a mile
the defendant laid before his brother and Fisher "a scheme"
to make money, and proposed that the three kill MacRae and
Allen and steal the sheep, suggesting that their possession of

the sheep could be explained by saying that MacRae had hired them to drive the sheep away. The witness objected to becoming a party to the proposed crime, but was induced by threats of the defendant to aid in its commission. Immediately after the conspiracy was formed, the three started towards the ranch of one Lewis, which is about 2 miles from the MacRae cabin, at which ranch MacRae, not having a pasture of his own, had left his wagon and horses for a few days; on the way there they saw MacRae at a distance, alone with his sheep. When they were near the house of Lewis, the witness and Fisher stopped, while the defendant went into the house and talked with Lewis. Upon his return the three went immediately to MacRae, who was then about a mile from Lewis' ranch, and a like distance from the MacRae cabin. Fisher had one of the guns, and witness the other. They went close up to McRae, and had a pleasant talk with him about the sheep, and asked him where he intended taking them. The three stood in a row, Fisher being next to the defendant, and the witness next to Fisher. The defendant was six feet from MacRae, and fronting him, seemingly waiting and watching for an opportunity to commit the murder while the eyes of MacRae were not upon his. The conversation lasted twenty or twenty-five minutes, and finally MacRae dropped his eyes and looked at his hands, in which he held a very small pocketknife and a little stick; then the defendant took the gun from Fisher and shot MacRae, who, in the graphic words of the witness, ''had a word in his mouth when he was shot; I couldn't tell what it was; I know he had it in his mouth, because he was speaking it when he was shot; he made a noise that indicated to me that he was going to speak.'' Death was instantaneous. The blood from the body formed two pools. The defendant at once complained of the failure on the part of his companions to act, saying that they were ''too slow,'' since he had desired and expected them to do the deed. The defendant searched the body, and took from it a silver watch, which, with its buckskin string, he appropriated to his own use, and wore until he was apprehended. MacRae

had also another knife, the importance of which fact will hereafter become apparent. Near the scene of the murder was a horse or pony of MacRae's; from it the witness, at the command of the defendant, took a quilt and a short rope, and, wrapping the former about the body, and attaching one end of the latter to the horn of the saddle, and the other to the feet of the corpse, he led the horse, and dragged the body a mile to MacRae's cabin. The pressure of the body upon the ground bent down the grass, and blood was visible in its wake; in the trail were left lint, fuzz, and fragments of the quilt. While the body of MacRae was being dragged, Fisher, with the same gun which had dispatched MacRae, killed Allen, who was about fifty feet in a direct line from the cabin. His body was also dragged in the same way as was MacRae's to the cabin; then both bodies were wrapped in tarpaulins taken from MacRae's cabin, and placed behind an adobe chimney. The sheep were then put into the corral, and the defendant and his associates went home. The next morning they returned to the cabin and chimney where the bodies had been deposited, and the defendant went to Lewis' ranch, and got the wagon and horses left there by MacRae. Into the wagon they put the food found in the cabin, and also a chest with iron handles, a shovel, and some other things of MacRae's. Then they put the bodies, still covered with tarpaulins, into the wagon. It was the intention of the defendant to sell the wethers at Forsyth, and ship the remainder of the flock after reaching the railway. In pursuance of this purpose they then began their wagon journey to the Musselshell river, on the afternoon of Sunday, September 25th, taking with them the sheep and three of MacRae's horses, and one belonging to the witness. On Monday afternoon, September 26th, the Musselshell river was reached; on the bank of the river, and five or six feet from the brink, they built a great fire of logs to burn the bodies, and placed them, together with the chest and its contents, taken from the cabin, upon the fire. The clothing worn by MacRae and Allen at the time they were killed had not been removed. From 2 o'clock to

12 o'clock midnight of that day the bodies burned, and the defendant and his companions from time to time replenished the fire. Daylight revealed only ashes and cinders. These the defendant and the witness cast into the river by means of the shovel taken from the MacRae cabin, leaving no apparent evidence of the fire, except the marks on the ground where it had been. The debris floated down on the surface of the stream a short distance, and was stopped by the still water in a hole. Commanded to do so by the defendant, the witness waded into the water and dislodged the cinders. They then proceeded on their journey, having first buried a tin box, a large knife, and a gun, which had also been taken from the cabin,—the difficulty of consuming these by fire being the reason they were buried, and not burned with the bodies and chest. Before reaching Forsyth, the defendant and his associates were captured by a *posse comitatus.* While in jail at Forsyth the defendant wrote a letter to the sheriff of Fergus county, which he delivered to the witness for that officer; the letter reached the sheriff, and is as follows:

"MILES CITY, Oct. 6, 1898.

*"Sheriff—Dear Sir:*

"Turn them boys loose; they haven't done anything.

"Yours truly,

"F. McRAE."

Such, in brief, was the testimony of the accomplice; and unless he was corroborated to the extent required by Section 2089, *supra,* the defendant should have been acquitted. Although the practice at the common law is for the court to charge the jury to view the testimony of an accomplice with caution, and to advise an acquittal unless such testimony be corroborated in some material part by other evidence, yet these cautionary and advisory instructions may be given or withheld in the uncontrolled exercise of an arbitrary discretion. This rule of the common law rests upon the premise that the defendant may legally be convicted of crime upon the unsupported testimony of his accomplice,—the only exception to the rule seems to be a prosecution for perjury or its subor-

nation, as was declared in *People* v. *Evans*, 40 N. Y. 1. Section 2089, *supra*, in express terms requires the accomplice to be corroborated by evidence from an independent source which in itself tends to connect the defendant with the commission of the crime; it does not, unless by implication, require the production of such other evidence with respect to the *corpus delicti*, the identity of the person killed, or any other particular. But, whatever may be the true construction of the section, we shall in this case assume, without deciding or intimating any opinion upon the matter, that its spirit requires the accomplice to be corroborated by other evidence which in itself, and independently of his testimony, tends not only to connect the defendant with the commission of the offense, but also to prove the *corpus delicti* and establish the identity of the person slain. The *corpus delicti* is the body or substance of the offense; this means, and has always meant, the existence of the criminal fact. In prosecutions for murder, proof of the *corpus delicti* involves the establishment of the fact that a murder has been committed, but includes neither the identity of the person alleged to have been killed, nor the killing by the person accused. Evidence that a murder has been done, whether by the defendant or another, is proof of the body of the offense. Section 358, *supra*, declares, among other things, that no person may be convicted of murder or manslaughter unless the death of the person alleged to have been killed be established by direct proof. The testimony of the accomplice was direct evidence of MacRae's death. His testimony, however, was not, as we assume for the purposes of this case, of itself sufficient to establish it; corroboration in this particular, while necessary, need not have been other than by indirect or circumstantial evidence of the identity of the decedent and MacRae. The true meaning of the statute in this respect is that in the proof of the *corpus delicti* there must be direct evidence establishing the death of a person,—the fact that the decedent is the person alleged to have been killed may be proved by circumstantial evidence, that is, by inferences drawn from the facts proved; or it may, of course, be estab-

lished by direct proof; for example, direct proof that somebody is dead becomes direct proof that MacRae is dead whenever by indirect evidence the remains are shown to be MacRae's. (*People* v. *Palmer*, 109 N. Y. 110, 16 N. E. 529; *State* v. *Pepo*, 23 Mont. 473, 59 Pac. 721.) This was the rule at common law; and has not been modified by Section 358 *supra*. Again, the direct testimony of the accomplice to the alleged fact that MacRae is dead becomes sufficient proof of his death when the accomplice is corroborated by independent evidence, indirect though it be, which tends to establish such fact. In this case the *corpus delicti*, the identification of MacRae as the person slain, and the perpetration of the crime by the defendant, were proved by the direct evidence, if true, of an eyewitness. To sustain a conviction upon such testimony, that witness, being an accomplice, must have been corroborated. Was the corroboration sufficient?

Smith, the stepfather of the defendant, testified, among other things, to these matters: He last saw Allen on the 20th day of September, 1898; MacRae he saw and talked with at 10 o'clock on the morning of the 24th, and each then agreed to assist the other in building fences and in doing certain work. Since that time Smith has not seen MacRae, although on the afternoon of the next day the defendant told Smith that MacRae was alive, as will hereafter appear. When Smith last talked with MacRae, the latter was in the vicinity of his cabin. Early in the afternoon of the 24th the defendant, his brother James, and Fisher, left the Smith home, returning about dark. Next morning, the 25th, they went away at 7 o'clock, the defendant and Fisher carrying guns. The defendant at about 1 o'clock returned and got a bed, which witness helped him to pack upon his horse; the defendant saying that he was going hunting. At half past 2 or 3 o'clock in the afternoon Smith saw the defendant and his two companions, who were then about three miles from MacRae's cabin. They had a wagon and four horses, and were driving or leading the MacRae and Hildebrand sheep. The witness went towards the wagon, but the defendant and his brother left the wagon and went to meet

Smith. The defendant told Smith that he was leaving with MacRae's sheep; that MacRae intended stealing Hildebrand's sheep, and was to pay the defendant $500 for assisting him in taking the sheep to Miles City. "When he spoke about he was to get $500 to help MacRae take the sheep over to Miles City, I asked him where Mac was. He says, 'He is in the wagon,' he says. 'He don't want to show up here,' he says, 'until he gets away, because he don't want nobody to see him.' " The witness did not get to the wagon, but saw it distinctly, observing that a wagon sheet or tarpaulin extended from the hind end to the back of the seat, covering the bed. The defendant asked Smith to write to him at Miles City, addressing the letter to "Charles A. Brown." The brother produced a book, in which the defendant wrote the assumed name. Then the defendant and Smith had a private conversation aside, in which he requested Smith not to sign his name to any letter so addressed; the defendant saying that it would be better to omit the signature. The defendant and his associates then drove off in the direction of the Musselshell river. From these circumstances, Smith feared that all was not as it should be,—MacRae and he on the morning of the 24th having agreed upon a plan of mutual assistance in their work; having been told by the defendant two hours previously, when leaving home, that he was going hunting,—the promise to pay $500 for services easily procurable for $30; the assumed name, and the larceny which the defendant so openly avowed,—these and other circumstances aroused the suspicions of Smith. He went immediately to the MacRae cabin, arriving there about 4 o'clock, or a trifle earlier, where he found the contents scattered so "that it looked to me as though a man had left things in there as though he would be back most any time,—the same day or the next day." At the adobe chimney adjoining the cabin he found a trail made by the dragging of some heavy body; in the trail were pieces of lint and stuff which had caught on the twigs, grass and ground, and in places the lint showed that it had been rolled under whatever had made the trail. He followed the trail for

about a mile.    There it stopped, and at that place, about 10 inches or a foot apart, were two pools of curdled blood, somewhat dry and hard.    A few moments afterwards he saw the defendant proceeding on his way with the sheep and horses. The next day, the 26th, he and his half-brother Lewis made a further investigation.    In the center of the trail they found a small, gray-handled pocketknife, and picked up some of the lint.    Two days afterwards, on September 28th, they made another examination, and found that a second trail ran into the first one discovered, the second trail being about 200 yards long, and ending with the first one at the chimney. Pony tracks were visible on each trail.    Where the trails stopped at the chimney there had been a large spot of blood, most of which had been shoveled into a hole, leaving on each side of the shovel's track a little strip of blood.    Behind the chimney was blood, and there they found a stick of wood with blood on one side of it, from which the blood had dripped to the ground beneath, where, in a hole, and covered over, were found other bloody sticks and dirt.    Smith was one of the posse that captured the defendant, who was found with the sheep, horses, wagon and watch.    On his return trip home, and on the 10th or 11th of October, Smith and others discovered on the bank of the Musselshell river, at a point where the defendant passed with his sheep, evidences showing that a large fire had been built very near the brink.    From a circular space 12 feet in diameter the ashes had been shoveled off, the marks of the shovel being distinct; towards and in the center the ground had been scraped clean, but near the edges there were some ashes and cinders, and the ground was blackened.    In the river at this point, just opposite the remains of the fire was a natural washout or hole.    There they spent a day and a half, finding in the edge of the water a piece of cinder or charred wood.    Making a raft of logs, and a ladle with a handle 8 or 10 feet in length, they proceeded to explore the hole.    They brought up, with cinders and ashes, four kinds of buttons, buckles, nails, pens, and pieces of bone and teeth, and fragments of skull, all showing the effect of

fire; there were enough of these things to fill a 10-pound lard pail.    Leaving the river, they went to the MacRae cabin, and saw where a bullet had grazed a tree distant about 150 yards from the cabin, and near the second and shorter trail; the bullet was discovered in another tree, four or five feet distant from the tree that had been grazed.

Witness Sherman was one of the men who apprehended the defendant and his companions on Porcupine creek, about 30 miles from Forsyth.    Sherman informed the defendant that he wanted him for the murder of MacRae and Allen; the defendant answered that both were alive and at Miles City. Upon his person were found some money, a pocketknife and a watch, the latter, at least, having admittedly belonged to MacRae.    At Forsyth, Sherman received from James Calder the letter addressed to the sheriff, and hereinbefore copied. The testimony of Sherman in respect of the finding of the bones, teeth, buttons, nails, buckles, pens, and the like, is substantially that of Smith.    Sherman then went to the MacRae cabin, saw the shorter trail, and followed the longer one to the place where Smith had found the two pools of blood on September 25th.    Witness took up a clot of the blood the size of a man's hand, and placed it in a cloth, producing it in that condition before the jury.    His testimony agreed with that of Smith as to the bloody stick in the hole found near the chimney, and in addition he gave reasons for his opinion that the physical facts indicated that "the bodies must have been laid across the sticks."

The witness Lewis testified:    That he saw the defendant at about 3 or 4 o'clock on the afternoon of September 24th; that the defendant said he had been hunting and "stopped in for a few moments, and that his companions were outside, waiting for him;" he further said to Lewis that he and MacRae were leaving the country with Hildebrand's sheep, "and asked me to write to him at Miles City, to let them know if Hildebrand made any disturbance about the sheep, the letter to be addressed to 'Charles A. Brown, Miles City,' and he would get it."    Between 8 and 9 o'clock in the forenoon of

the next day the defendant again went to see Lewis, and on that occasion informed Lewis that MacRae had hired him for a few days, and had sent him to get the team and wagon belonging to MacRae, for use at MacRae's place for a short time.   On the morning of the 26th of September Lewis saw the two trails, and corroborated Smith's and Sherman's testimony respecting their appearance.   Lewis testified further: That in the longer trail he found pieces of quilt, wool, and a jackknife; behind the chimney "we found where there had been some poles piled up, and blood,—looked like somebody had been piled up in there,—blood there on some sticks." The shorter trail was about 200 to 250 yards long, and led from a patch of timber to the chimney, and showed evidences that something heavy had been dragged over it.

Other witnesses testified as did Smith, Sherman and Lewis with respect to the trails, and the fragments taken from the river at the place where the great fire had been.   Two iron handles, suitable to a chest, were also found in the hole.   A physician and surgeon, called as an expert, declared that the bones had been subjected to the action of either a considerable degree of heat or long-continued heat; that the bones and teeth were those of an adult human being, and, in his opinion, of two persons.

The defendant was a witness in his own behalf.   He denied the killing. but said he had no doubt, from all appearances, that both MacRae and Allen were dead.   His story, in brief, is this:   MacRae and Hildebrand owned a flock of sheep in common;  MacRae asked defendant to steal Hildebrand's sheep and go away with the entire flock, which defendant on the 24th day of September consented to do, MacRae agreeing to pay him $500 in hay, the wagon, team, harness, and the like; Lewis had made arrangements to buy the hay from the defendant; on the afternoon of the 24th the sheep were counted and divided into two bands, each containing the same number, but no plausible reason was shown why such division should have been made; that afternoon MacRae, Allen and the defendant, with his associates, prepared the contents of the

cabin for transportation by wagon; next morning they saw Allen and MacRae at the cabin,—the latter told him to go for the wagon at Lewis', which he did; and then the wagon was loaded; defendant, his brother and Fisher started away with the sheep at about 12:30 o'clock in the afternoon; MacRae and Allen had their packs ready, and intended to leave the country as soon as they got three horses which were near by; MacRae's plan was to purchase 300 sheep on the way to Miles City, so that the band, when sold, would bring $6,000, which amount he desired to have when fleeing the state; in the next breath, however, the defendant testified that, instead of purchasing, MacRae intended, on the way to Miles City, to steal all the sheep that he conveniently could.   The defendant never · saw or heard of or from MacRae or Allen after he left them at the cabin in the afternoon of the 24th.   From the cabin the defendant went to Smith's house for a bed, and told his mother that he was going hunting, but would return in a few days. When he met Smith, and asked him to write to Charles A. Brown, at Miles City, he did not tell Smith that MacRae was in the wagon.   He admits writing the letter from Forsyth to the sheriff, and signing. MacRae's name to it, and that he made no effort to ascertain whether MacRae or Allen was in Miles City, although he believed they were in that town. The defendant's testimony abounds in discrepancies and absurdities, and is shown to be untrue in material matters by circumstances and the statements of disinterested witnesses.

This evidence was sufficient to satisfy the requirement of section 358, *supra*, that the death of the person alleged to have been killed must be established by direct proof as a fact independent of the fact of the killing by the defendant; it was, indeed, ample.   The death of a human being was directly proved by the identification of certain teeth and charred bones as those of an adult person; that the decedent was MacRae was established by the direct testimony of the accomplice, corroborated by circumstantial evidence which in itself tended to prove such identity.   The provisions of section 2089, *supra*, were also met by the proofs:   The accomplice was corrobo-

rated by other evidence which in itself, and without the aid of the testimony of the accomplice, tended to connect the defendant with the murder of MacRae. It is not necessary that the evidence in corroboration of the accomplice must be of sufficient strength, when standing alone, to connect the defendant with the commission of the crime, or to establish his guilt; if it tends in and of itself alone to prove the defendant's connection, it is sufficient. *State* v. *Geddes*, 22 Mont. 68, 55 Pac. 919; *People* v. *Elliott*, 106 N. Y. 288, 12 N. E. 602; *Murray* v. *Com.* (Ky.) 28 S. W. 480; *State* v. *Townsend*, 19 Or. 213, 23 Pac. 968; *State* v. *Russell*, 90 Iowa, 493, 58 N. W. 890; *Fort* v. *State*, 52 Ark. 180, 11 S. W. 959; *People* v. *Christian*, 78 Hun. 28, 29 N. Y. Supp. 271; *People* v. *Grundell*, 75 Cal. 301, 17 Pac. 214.) The statement by the defendant to Smith that MacRae was in the wagon, but did not wish to be seen, and his possession of the dead man's watch, sheep, horses and wagon, were, under the circumstances, and without reference to the testimony of the accomplice, evidence tending to connect the defendant with a murder as appalling and fiendish in its commission and incidents as was ever perpetrated in Montana. Nor was it necessary that the whole case for the state should have been established by the corroboratory evidence: (*People* v. *Hooghkerk*, 96 N. Y. 149.)

3. The court charged that the defendant was either guilty of murder of the first degree, or not guilty of any grade of homicide, saying to the jury that a definition of murder of the second degree would be of no use, because the defense was that the defendant had nothing to do with the killing of Mac-Rae. Of this the defendant complains, upon the ground that the degree should have been left for the jury to find. We remark, in passing, that the reason assigned by the court for omitting to define murder of the second degree is unsound; nevertheless, if the instruction itself be correct, it will not be vitiated by the statement of a wrong reason in its support.

The element which raises murder of the second degree to murder of the first degree is deliberation. Where the proof of guilt on a trial for deliberate murder is to be deduced from

circumstantial evidence alone, the court should ordinarily, and perhaps always, charge the jury as to murder of the first and second degrees, and should also charge as to manslaughter whenever there is any evidence tending to negative the presence of malice; for in such cases the circumstances may permit of inferences tending to show the commission of different grades of felonious homicide. If the killing was unlawful only, manslaughter is the crime; add to the element of unlawfulness malice aforethought only, and murder of the second degree is the crime; and, lastly, add deliberation to unlawfulness and malice aforethought, and murder of the first degree is the crime. Even in cases depending for proof of guilt largely or chiefly upon direct evidence, the omission to instruct with respect to murder of the second degree is a dangerous practice, and would in most cases constitute error sufficient to reverse a judgment convicting the defendant of the higher crime; the reason being that the question of fact of whether or not the element of deliberation was present is, save in very exceptional cases, to be determined, not by the court, but by the jury. The case at bar, however is exceptional. The murder alleged, if committed, was, under the evidence, deliberate, or MacRae was not unlawfully slain. Unless the jury believed the story of the killing as related by James Calder, they could, under their oaths, do nothing but find the defendant not guilty. If they believed it, the verdict could be nothing less than guilty of murder of the first degree. It is not the duty of the court to charge upon murder of the second degree, or upon a lower grade of homicide, where there is no evidence, direct or circumstantial, to which the instruction could apply. (*State* v. *Hopper*, 71 Mo. 425; *State* v. *Umble*, 115 Mo. 452, 22 S. W. 378, approved in *State* v. *Fairlamb*, 121 Mo. 137, 25 S. W. 895; *State* v. *Estep*, 44 Kan. 572, 24 Pac. 986; *Fertig* v. *State*, 100 Wis. 301, 75 N. W. 960; *Jones* v. *State*, 52 Ark. 345, 12 S. W. 704; *Smith* v. *U. S.*, 1 Wash. Ter. 262; *Washington* v. *State*, 36 Ga. 222; Bish. New Cr. Proc. Vol. I, Sec. 980, subd. 2, and cases there cited; *Thomason* v. *Territory*, 4 N. M. (Johns.) 150, 13 Pac.

223; *People* v. *Chavez,* 103 Cal. 407, 37 Pac. 389; 10 Enc. Pl. & Prac. 164; *Cornell* v. *State* (Wis.), 80 N. W. 745; *Territory* v. *McAndrews,* 3 Mont. 158.) The defendant in this case is guilty of murder of the first degree, or he is innocent. There is no possible intermediate ground.

4. The defendant prayed, and the court refused to give, a charge in respect of the burden resting upon the state to establish beyond a reasonable doubt the existence of each link in the chain of circumstantial evidence. The court did not err. The question of guilt or innocence was not dependent upon circumstantial evidence alone, or in a controlling degree upon such evidence, and therefore the case did not require a special instruction as to that means of proof. There was direct evidence of the main fact, and the indirect evidence was merely in corroboration. ( *Wooldridge* v. *State,* 13 Tex. App. 443; *Buntain* v. *State,* 15 Tex. App. 515; *Leeper* v. *State,* 29 Tex. App. 154, 15 S. W. 411.) Were the refusal to charge specifically upon circumstantial evidence held to be error in all cases where it, in conjunction with direct evidence, is relied upon as tending to prove guilt, the cases free from error in that regard would be extremely few; for in almost every, if not in every, prosecution there is indirect evidence of a material nature. In the case at bar the court fully and accurately charged the jury upon the law applicable to the facts, including the instruction usually given upon the subject of reasonable doubt, and the defendant has no just cause to complain.

Finding the record free from error, the order refusing a new trial is affirmed.

*Affirmed.*