STATE, RESPONDENT, *v.* McDONALD, APPELLANT.

(No. 3,644.)

STATE, RESPONDENT, *v.* BRADLEY, APPELLANT.

(No. 3,645.)

(Submitted May 3, 1915. Decided May 22, 1915.)

[149 Pac. 279.]

*Criminal Law—Kidnaping—Witnesses—Indorsement on Infor-
mation—Trial—Instructions.*

Criminal Law—Witnesses—Indorsement on Information.
    1.  Omission by the county attorney to indorse the names of material witnesses for the state upon an information, as required by section 9109, Revised Codes, either because not known to him at the inception of the prosecution, or through negligence or ignorance, is not sufficient reason to make their testimony inadmissible.

Same.
    2.  Even though a county attorney knew of witnesses whose names he did not indorse upon the information at the time of its filing, it was still within the discretion of the trial court to allow them to be examined.

Same—Violation of Statute—Effect.
    3.  Where a county attorney violated the express injunction of section 9109, Revised Codes, by indorsing the name of a witness as "John Doe Mitchell," whereas he knew his true name to be "James Mitchell,"

defendant was not entitled to a new trial in the absence of a showing that he had been prejudiced by the officer's delinquency.

Same—Trial—Exclusion of Witnesses—Disobedience of Order—Effect.

4. One who had not been subpoenaed and did not know that he would be called as a witness was properly permitted to testify, though he remained in the courtroom after an order of exclusion of witnesses had been made by the court under section 8016, Revised Codes.

Same—Disobedience of Order—How Punishable.

5. Disobedience of an order of court excluding witnesses from the courtroom may be punished as for a contempt, and not by depriving the party whose witness he is, of his testimony.

Same—Offer of Proof—Insufficiency.

6. In a prosecution for kidnaping, an offer to prove that an officer of the National Guard who had defendant under arrest offered to give him his freedom, a sum of money and a railroad ticket, provided he would plead guilty, was properly rejected where the facts attending the arrest were not before the court or incorporated in the offer.

Same—Kidnaping—Evidence—Sufficiency.

7. In a prosecution for kidnaping brought against leaders of a labor union, evidence *held* sufficient to sustain a conviction.

Same—Instructions—Lesser Offenses.

8. While in cases in which the charge preferred includes minor offenses or different degrees of the same crime, and the evidence is in such a condition that the jury may find the defendant guilty of a lower degree than that charged, or of an included offense, the court must so formulate the charge as to enable the jury to find according to their view of what the evidence justifies, it need not so charge where the evidence is such as to show that the defendant is either guilty of the crime charged or is entitled to an acquittal.

*Appeal from District Court, Jefferson County; Wm. A. Clark, Judge.*

MICHAEL McDONALD and Joseph Bradley were convicted of kidnaping, and appeal from the judgment and from orders denying them new trials. Affirmed.

*Messrs. Maury, Templeman & Davies, Mr. I. G. Denny* and *Mr. M. J. Doepker,* for Appellants, submitted briefs; *Mr. H. L. Maury* argued the cause orally.

In behalf of the State, *Mr. D. M. Kelly,* Attorney General, and *Mr. C. S. Wagner,* Assistant Attorney General, submitted a brief; *Mr. Wagner* argued the cause orally.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

These are separate appeals by the defendants from judgments convicting them of the crime of kidnaping and orders denying

their respective motions for new trial. They were charged jointly and tried together. Though the appeals are presented upon separate records and under separate numbers, since the contentions made in behalf of both defendants are substantially the same, counsel submitted them, and they are considered, together. The information was originally filed in Silver Bow county; the act constituting the offense having been committed there. At the instance of the state a change of venue was ordered to Jefferson county, where the trial took place. The charging part of the information is:

"That at the county of Silver Bow, State of Montana, on or about the 27th day of August, A. D. 1914, and before the filing of this information, the said defendants did willfully and unlawfully, wrongfully and intentionally and feloniously, seize, confine and kidnap one Patrick Towey, a human being, with intent in them, the said defendants, then and there to cause the said Patrick Towey, without authority of law, to be kept and detained against his, the said Patrick Towey's, will."

The charge was preferred under section 8306 of the Revised Codes, which declares: "Every person who willfully—(1) seizes, confines, inveigles or kidnaps, another with intent to cause him, without authority of law, to be secretly confined or imprisoned within this state, or to be sent out of the state, or in any way held to service or kept or detained against his or her will or against the will of his or her parent or guardian, whether such guardian be natural or appointed,  *  *  *  is guilty of kidnaping and is punishable by imprisonment in the state prison for not less than one year."

This section was construed by this court, on application of the defendants and others for their release on *habeas corpus,* on the ground that the information does not charge a felony. (*Ex parte McDonald,* 50 Mont. 348, 146 Pac. 942; *Ex parte Bradley,* 50 Mont. 354, 146 Pac. 944.) It was determined that it includes within its purview as distinct offenses these several acts, *viz.:* The seizure, *etc.,* of one person by another with intent to cause him, without authority of law, (1) to be secretly confined

or imprisoned in this state, (2) to be sent out of the state, or (3) to be in any way held to service or kept or detained against his will, or against the will of his or her parent or guardian, whether such guardian be natural or appointed. Upon further consideration of the provision we are satisfied that the construction given it in these cases is correct. We shall therefore pass without notice the contention again made by counsel, that the information herein does not charge a felony, in that it omits entirely the element of secrecy.

During the course of the trial several witnesses were examined [1] and gave testimony which was material to the state's case, whose names had not been indorsed upon the information at the time it was filed. Counsel for defendant's objection to each of them, on the ground that the county attorney had not observed the requirement of the statute in this behalf (Rev. Codes, sec. 9109), was overruled. These rulings are assigned as error. The statute requires the names of the witnesses for the state to be indorsed upon the information when it is filed, if they are known. There is no provision requiring the names of witnesses subsequently discovered, either before the opening of the trial or during its progress, to be indorsed; nor is there any provision prohibiting the examination of such witnesses. The purpose of the statute is manifest, *viz.*, that the defendant, so far as reasonably possible, may be advised of the witnesses known to the county attorney when the information is filed, whom the state intends to call against him, in order that he may have the opportunity to make inquiry with respect to them and prepare himself to meet their testimony. (*State* v. *Sloan,* 22 Mont. 293, 56 Pac. 364; *State* v. *Calder,* 23 Mont. 504, 59 Pac. 903; *State* v. *Schnepel,* 23 Mont. 523, 59 Pac. 927; *State* v. *Biggs,* 45 Mont. 400, 123 Pac. 410.) The county attorney cannot be required to disclose the names of witnesses whom he does not know. Nevertheless the state may not be deprived of the benefit of their testimony because they are not known to the county attorney at the inception of the prosecution (*State* v. *Schnepel, supra*); and this is true whether lack of knowledge on the part

of this officer has been due to his want of assiduity in the preliminary preparation of the case or not. His negligence due to indolence, or even his incompetent knowledge of his important duties, cannot be alleged as a reason why a full disclosure should not be made of all the facts which are material to the state's case. The defendant is entitled ''to appear and defend in person and by counsel; to demand the nature and cause of the accusation; to meet the witnesses against him face to face; to have process to compel the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed,'' subject to the right of the state to have a change of venue in certain cases. (Const., Art. III, sec. 16.) If during the presentation of the case the court has accorded him all these rights, and, further, has guarded him against surprise by the introduction of evidence against him by the state which he cannot meet or the effect of which he cannot minimize, so far as this would have been possible by previous knowledge of the witnesses, he cannot complain that the county attorney has failed to pursue the statute. The provision was intended as a safeguard to the accused against surprise and unfair advantage by the prosecuting officer, and to serve the same purpose as a like provision relating to the disclosure of the names of witnesses upon whose testimony an indictment is found and returned by a grand jury. (Rev. Codes, sec. 9140.) Neither was intended, however, to operate as an impediment to prevent or delay the progress of a prosecution, except so far as is necessary to enable the defendant to have reasonable opportunity to prepare his defense. When his complaint is that he has not been accorded sufficient time for preparation, or that he has been surprised by the state's production of evidence which he has not been allowed an opportunity to meet or controvert, and he makes such a showing to the court as to justify the conclusion that his complaint is well founded, then, and then only, has he a right to allege prejudice.

It was never intended that criminals should escape punishment or delay the course of justice merely because the public prosecutor has ignorantly or carelessly omitted to observe the rule prescribed by the statute. If the charge is preferred by indictment, the indictment will be set aside upon timely motion, if the names of the witnesses are not indorsed. (Rev. Codes, secs. 9140, 9193.) This is not true of an information; nevertheless, if timely request is made, the court ought doubtless to require a disclosure of the names of the witnesses then known. Even so, after the trial is over, and it is not shown or even claimed that the defendant has suffered prejudice by reason of the production of witnesses by the state whose names had not theretofore been disclosed, he cannot insist that his conviction was obtained unlawfully. So far as the command of the statute is concerned, it has been obeyed literally when the names of known witnesses have been indorsed at the time of filing. If others are subsequently discovered whose evidence is material, the county attorney would be remiss in his duty if he should fail to call and examine them if the necessities of the case required it. (*State* v. *Schnepel* and *State* v. *Sloan, supra.*) The court will presume that this officer has in every case done his duty, until the contrary appears; for the presumption prevails that he has observed the requirements of his official oath.

In the case of all these witnesses, except two, the county attorney stated that their names were not known to him at the time he filed the information. With reference to these he made [2] no statement. If it had appeared that he knew them all at the time the information was filed, it was still within the discretion of the court to allow the examination to proceed without delay. (*State* v. *Schnepel, supra.*)

The name of the witness James Mitchell was indorsed as John [3] Doe Mitchell. Upon objection to his examination for this reason, the county attorney stated that he purposely so indorsed the name, because he believed that, if he had disclosed the true name at the time he filed the information, the witness' life would have been in danger. The purport of this statement will

be made clear by reference had to a summary of the evidence hereafter made, showing the circumstances under which the offense charged was committed. Whether the fears of the county attorney were justified by the circumstances and he acted in good faith, we need not stop to inquire. That he violated the express injunction of the statute is clear. His conduct was indefensible from any point of view. Since the true name of the witness was known to him. it was his clear duty to indorse it without reference to the consequences to the witness, because the injunction of the statute is without exception or proviso, and leaves him no discretion. It is incumbent upon him to obey it in order that the defendant may be accorded all the rights he is entitled to under the law, however plausible the reason may be moving him to evade it. It was his duty, so far as lay in his power, to protect the witness. Nevertheless this duty did not contemplate an omission of his duty to the defendant, nor did it require him to disobey the statute. But the neglect by this officer to pursue strictly his statutory duty in his presentation of the case is not of itself a reason why the defendants should be awarded a new trial. It does not appear that the defendants in this case suffered any prejudice by his delinquency. It is not claimed by counsel that they did. There was no attempt to show that they were surprised or unable to meet the testimony given by the witness. The argument is merely that the county attorney purposely failed to perform his duty, and therefore the conviction should be set aside. The argument is without merit.

Under the provisions of the statute applicable, this court may not set aside a conviction otherwise proper because of error which has not prejudiced, or apparently tended to prejudice, the defendant in respect to a substantial right. (Rev. Codes, secs. 9415, 9548; *State* v. *Gordon*, 35 Mont. 458, 90 Pac. 173; *State* v. *De Lea*, 36 Mont. 531, 93 Pac. 814; *State* v. *Rhys*, 40 Mont. 131, 105 Pac. 494.)

Under section 8016 of the Revised Codes the judge may in [4] any case exclude from the courtroom witnesses of the adverse party not under examination, in order that they may not

hear the testimony of the other witnesses. At the opening of the trial, and upon the request of the defendants, the presiding judge ordered all the witnesses excluded. The witness Keller, a deputy sheriff in charge of the defendants, who had been held in custody, remained in the courtroom. He had not been served with a subpoena, and the county attorney did not know when the order was made that it would be necessary to call him to testify. His testimony was substantially material. When he was called counsel for defendants objected on the ground that he had disqualified himself from testifying by disobeying the order of exclusion. The court overruled the objection, and allowed him to testify. There was no error. The order of exclusion could not apply to anyone who did not expect to be called as a witness. [5] Even if the order had applied to Keller, the penalty for his disobedience should have been inflicted upon him by punishing him for contempt, and not upon the state by excluding his evidence. Of course, in so far as by his conduct in violating such order a witness manifests unusual interest in the result of the trial, he furnishes ground for the jury to question the credibility of his testimony; nevertheless he is not thereby disqualified to testify, nor may the party whose witness he is be deprived of his testimony.

Some evidence was introduced by the state which tended to [6] show that after the commission of the offense charged the defendants fled from the locality and concealed themselves to avoid arrest. To rebut the inference that this conduct was prompted by a consciousness of guilt, the defendant Bradley, in addition to an explanation why he fled and concealed himself, offered to show that one Frank Conley, who was at the time acting as provost marshal of the National Guard, and who had this defendant under arrest, offered to give him his permanent freedom, the sum of $100, and a railroad ticket to Seattle, provided he would plead guilty and let an ostensible judgment be pronounced against him fixing his punishment at three years in the state prison, and that he refused to accept his liberty under these terms. The offer was rejected, and the ruling is assigned as

error.   The ruling was proper.   It will be noted that the offer does not disclose where the alleged arrest of Bradley by Conley had been made, when it had been made, upon what charge, or where he was being held or by what authority.   In fact, if it be assumed that the circumstances were such that proof of Conley's offer would have rebutted conclusively any inference of conscious guilt, the circumstances under which it was made are not disclosed.   It does not appear whether the offer had any relation to the charge upon which Bradley was being tried, nor whether it arose in Silver Bow county.   Indeed, it does not appear where Conley was acting as officer of the National Guard. It is true that from proceedings heretofore had in this court the members of this court know that at or about the time both defendants were arrested for the crime charged in this case the governor sent a regiment of the National Guard into Silver Bow county to quell disorders growing out of a controversy between local labor unions.   Except that there were such disorders, and that the charge against the defendants grew out of them, the conditions are not disclosed either by the record or the offer. There was, therefore, nothing before the court which it could look to as illustrating and rendering competent the offered evidence.   The correctness of the ruling of the trial court in such a case is to be tested by the attendant facts which are either already in evidence before it or are incorporated in the offer. The judge cannot be presumed to take judicial notice of what the conditions were at the time.   While he may be presumed to have known in a general way of the action of the governor and the causes leading up to it, who, in fact, were the officers in charge of the military forces and their particular acts and doings were matters of proof, as any other facts pertinent to defendants' case.   Of course, the offered evidence had not the slightest relevancy to the case as made against the defendant McDonald.

Of the many other assignments argued by counsel, none are of sufficient merit to require special notice, save two, *viz.*: That the evidence is not sufficient to justify the verdict; and that the

court erred in refusing to submit a requested instruction as to the included minor offenses of false imprisonment and assault in the third degree. We shall not undertake to set forth the evidence in detail. A statement of a few of the most salient features of it, with the legitimate inferences to be drawn therefrom, will be sufficient to demonstrate that the conclusion of the jury is fully sustained by it.

Some weeks prior to August 27, 1914, a schism had occurred [7] in the Butte local union of the Western Federation of Miners, resulting in the formation of a new organization called the Butte Mine Workers' Union, by members who had become dissatisfied with the management of the affairs of the old union and others. The new union had grown until its membership was approximately 7,000. Defendant McDonald was its president, and Bradley its vice-president. The condition of feeling between the members of the new and the old unions had been bitter from the start. This bitterness increased as the new organization grew, until it had reached the stage of open and violent hostility. Among the standing committees appointed by this union to attend to the details of its affairs was one consisting of fifteen members whose duty, among others, was to solicit persons to become members of it. The committee had visited one of the mines of the Anaconda Copper Mining Company on August 26, at the hour at which the miners were changing shift; the purpose being to permit no one to go to work who was not in good standing in the new union. It was then announced that on the following day no one would be permitted to enter the mine unless he could exhibit to the committee a card showing him to be a member in good standing. Accordingly, on August 27, at 8:30 or 9 o'clock in the morning, the committee was present, accompanied by the defendants and a large number of other persons, many of whom were members of the union. Many others were present out of curiosity to observe what would be the outcome. The entire number was stated by some of the witnesses to be more than 1,000 persons. As the men who were intending to go on shift passed in the line before the window of

the time-keeper of the company, to indicate their presence for
work on the morning shift, the committee, assisted by others,
would demand of each of them that he show his membership
card. If anyone could not show a card he was ordered out of
the line and compelled to go into a ring of men consisting of mem-
bers of the committee and a number of others who were giving
their aid and assistance. They were there held in custody until
the inspection of cards had been completed. In all thirty-two
men were thus taken into custody. Among these was one
Martin Glackin. During the examination of the cards two other
men, Martin Harkins and Patrick Towey, were found by some
of the committeemen or other members of the union present, as
they were passing through the yard. After being questioned
concerning their presence there, and stating that they were there
to go to work, they were taken into custody and held with the
other thirty-two. When the examination had been completed, the
thirty-four persons were lined up and marched under guard
to the hall of the union for the purpose of ascertainment, by
trial, whether the prisoners were acceptable material for mem-
bership in the union and were willing to join it. When the hall
was reached it was found that it was too small to accommodate
the crowd; whereupon the proceedings were adjourned to a
vacant lot several blocks away. The prisoners were taken to
this lot and put into a ring formed by the committee and its
partisans. One Chapman, the chairman of the committee, as-
sumed the role of presiding officer, and presided until, becoming
tired, he called McDonald to take his place. McDonald presided
until the end of the proceedings. Glackin, Harkins and Towey
were put into a class by themselves to be disposed of last. The
rest of the prisoners were called one at a time. Each one was
hoisted upon a piano-box by the side of Chapman or McDonald,
as the case might be, in sight of the crowd, which had increased
in size until it numbered perhaps 2,000. As soon as each, upon
being questioned, signified his willingness to sever his connection
with the old union and become a member of the new one, he was
by a majority vote of the committee and its partisans, released

and permitted to go, upon his promise that by 7 o'clock in the evening he would join the new union. Thus all were released except Glackin, Harkins and Towey. As to these the overwhelming sentiment was that they were not suitable persons to become members of the union, because as was declared by persons taking part in the proceedings, they were "company stoolpigeons," that is, had been divulging to the Anaconda Company the secret doings of the old union, and hence that, not being fit to become members of the new union, they must be deported from the city. The trials of these three were conducted amidst calls for a rope to hang them, or suggestions that the "rollers" be put under them, that is, that they be deported out of the city, and other like expressions. McDonald advised against deporting them, urging the committee to put them upon probation. Admitting, however, that a majority must rule, he finally put the question as to whether they should be deported. It was carried. A photographer was then called to take their pictures. They were compelled to pose for this purpose. When this had been accomplished, the three were marched under guard to a point about a mile west of the limits of the city, where they were released after being told to go and keep going, and not to return to the city until they had communicated with McDonald and ascertained that they could do so with safety. At no time were any of the prisoners subjected to personal violence by those having them in charge, except that Towey, who, when taken into custody, was armed with a revolver and offered resistance, was forcibly seized and disarmed, and that one of those who acted as guard during the march from the mine to the union hall twisted Glackin's ear because he did not walk fast enough. Nevertheless, there is abundant evidence to show that all of the persons submitted to the will of the committee because of the show of force made by the number of persons who accompanied and assisted it to accomplish its purpose, and the hostile spirit manifested by their words and acts. It appears beyond question that the committee, backed by other members of the union accompanying it, was determined to require submission to its demands by all who

were not members of the new union, and not only so, but to visit
upon all who proved recalcitrant or were deemed unfit for mem-
bership the penalty of deportation. This purpose was shown
by expressions uttered by the persons taking part throughout the
entire proceeding, as well as by the result. By a show of force,
short, it is true, of personal violence or physical seizure, except
in Towey's case, the committee put under restraint the thirty-
four men and held them under detention at its pleasure, the
time covering the entire forenoon, in the case of Towey and his
two companions, who were released and told to go about noon.
Under the circumstances, the seizure was as complete and effec-
tive as if each one of the persons had been put in irons. Their
detention was continued until it had been determined what dis-
position was to be made of them, and finally the three objec-
tionable ones were compelled to submit to the indignity of being
forced to pose for the photographer and then marched out of the
city.

No one will question the right of a body of men employed in a
particular industry to associate themselves together for the pur-
pose of bettering their condition morally, intellectually, socially
or financially. Under modern conditions, labor unions, prop-
erly conducted, serve a useful and beneficial purpose, and it
may be conceded that they are sometimes necessary to enable the
individual member to secure proper consideration and treatment
from his employer. They are at liberty to increase their mem-
bership by solicitation, by persuasion, by argument, or by any
other means which does not infringe upon the personal liberties
of others. But they cannot lawfully resort to coercion by
threats or violence to accomplish their purposes, whatever they
may be. They cannot lawfully prevent any person from em-
ploying whom he will or from engaging in such work as he may
choose. The pursuit of happiness in all lawful ways is among
the inalienable rights of every man, and no individual man nor
body of men, for whatever purpose they may be associated, can
justify an infringement of this right. It may well be conceded
that the committee would have been within the law if its pur-

pose in going to the mine had been only to solicit, in a peaceable
way, the persons found there to become members of the union.
It may be conceded, further, that if it had been agreed by the
company that no one should be retained in its employ unless he
was a member of the union, it would have been lawful for the
committee to be present to see that the agreement was being ob-
served and to offer remonstrance, if such was not the case.
Yet it had no right to resort to coercion, by a show of force or
actual violence, to accomplish either purpose. The purpose of
the committee in visiting the mine had its inception in wrong.
It was not to persuade the members of the old union to join the
new union. As shown by the announcement made on the pre-
ceding day and the course pursued on the 27th, the purpose was
to prevent by force, if necessary, any member of the old union
from going to work. Assisted by its partisans, it did this. Not
only so; it manifested the purpose by the subsequent proceed-
ing to make an example of those who attempted to violate the
edict of the previous day. There can be no doubt that every
person who was present and gave aid and encouragement to the
proceedings was guilty of kidnaping Towey, under the third
clause of the subdivision of the statute quoted. That the pris-
oners, before they were taken from the mine to the place of trial,
signified their willingness to join the union, as the evidence tends
to show, cannot be accepted as proof that they consented to any
part of the proceedings. As already stated, they submitted be-
cause they dared not resist, and therefore their detention was
against their will.

But counsel say that the defendants, not being members of
the committee, took no part in the proceedings other than such
as spectators might, and therefore were improperly held guilty.
Let us see if this is so. They were the principal officers of the
union. Inasmuch as the committee had been deputed to ac-
complish the purpose of its visit, they had no cause to accom-
pany it, unless it was to aid and to see that it performed its duty.
Neither one offered even a plausible explanation as to why he
was present. Both remained throughout the proceeding result-

ing in the arrest of the men. Accepting their statement on the subject as true, they advised against personal violence to any of the men, but they did not advise against their arrest and sub-jection to the indignities they afterward suffered. On the contrary, they accompanied the committee with the prisoners to the hall and thence to the place of trial. Their offer of advice against the infliction of violence upon the prisoners was of itself, in the light of the attendant circumstances, an implied assent to the legality of the course being pursued by the committee. McDonald actually presided over the proceedings during most of the time, thus directly recognizing the authority assumed by the committee and aiding and encouraging it in carrying out its purpose. It is true there is evidence which tends to show that he advised against deporting Towey and his companions, and urged that they be put upon probation; but here again, if we accept this evidence as true, he impliedly recognized the authority of the committee, for, when judgment had been pronounced against them, he announced it, and then accompanied the committee as it marched them from the city, bidding them good-by, and telling them to communicate with him and he would inform them when it would be safe for them to return. His acts, interpreted by all the circumstances, enforce the conviction that he was not merely an aider and abettor in everything done, but that he was the leading spirit. The evidence showing Bradley's active participation in the affair is much less direct and convincing, but the jury were warranted in finding him guilty also. As already shown, he was present from the beginning to the end, attending the committee until they released the men at the outskirts of the city. In addition to this, there is evidence which shows that he occupied a prominent position in the ring surrounding the men during the trials, and that he apparently kept a list of them as they were successively called and disposed of. There is also evidence that he was in consultation with Mc-Donald while the latter was presiding as chairman, and that, when the name of a prisoner was called, Bradley would find him and lead him up for trial. As is usual in such cases, the

evidence is in conflict, but the credibility of the witnesses was for the jury to determine, and their conclusion is not subject to review by this court.

Throughout the foregoing discussion we have assigned to the committee primary responsibility for all the proceedings. In fact, however, the purpose in taking the prisoners to the hall was to have the union itself determine what should be done with them, and thus responsibility for subsequent proceedings was apparently assumed by the union at large.

It is argued that, since the crime of kidnaping necessarily in-
[8]  cludes the minor offense of false imprisonment and assault in the third degree, it was incumbent upon the court, under section 9172 of the Revised Codes, to submit appropriate instructions as to these offenses, thus leaving it to the jury to determine whether the evidence disclosed a case of kidnaping or one of the minor offenses only. For the purpose of these cases we may adopt the assumption of counsel that every kind of kidnaping defined in the statute includes the minor offenses mentioned, though we by no means concede that the assumption is correct; nevertheless we think the argument not maintainable. The statute recognizes the rule, which prevails generally, that in cases in which the charge preferred includes minor offenses or different degrees of the same crime, and the evidence is in such a condition that the jury may find the defendant guilty of a lower degree than that charged, or of an included offense, it is incumbent upon the court to so formulate the charge as to enable the jury to find according to their view of what the evidence justifies. In many instances, however, the evidence is such as to show that the defendant is either guilty of the offense charged or is entitled to an acquittal. In such cases the court may not be put in error for refusing or failing to instruct as to the lower degree or the included offense. The following cases are illustrative: *State* v. *Calder,* 23 Mont. 504, 59 Pac. 903; *State* v. *McGowan,* 36 Mont. 422, 93 Pac. 552; *State* v. *Jones,* 48 Mont. 505, 139 Pac. 441; *Stevenson* v. *United States,* 162 U. S. 313, 40 L. Ed. 980, 16 Sup. Ct. Rep. 839; *People* v. *Barney,* 114 Cal. 554, 47 Pac. 41; *Robin-*

*son* v. *State,* 84 Ga. 674, 11 S. E. 544; *Crowell* v. *People,* 190 Ill. 503, 60 N. E. 872; *State* v. *Alcorn,* 137 Mo. 121, 38 S. W. 548; *Thurman* v. *State,* 32 Neb. 224, 49 N. W. 338; *Good* v. *State,* 1 Lea (Tenn.), 293. See, also, 12 Cyc. 640; McClain on Criminal Law, sec. 391.

The evidence epitomized above points to but one of two conclusions, *viz.,* that the defendants committed the crime of kidnaping by participating in the proceedings, or that they were only curious, innocent spectators of the crime committed by others. There can be no doubt that Towey was kidnaped by some body of persons, because he was seized and held and detained against his will until it was determined that he must leave the city, and that he was then compelled to do so. There is no doubt that his personal liberty was violated, within the meaning of the statute defining the crime of false imprisonment. (Rev. Codes, sec. 8324.) There is no less doubt, however, that the invasion of his liberty was such as to constitute the aggravated offense. The only question really controverted in the evidence was whether the defendants were participants. Therefore the only office the requested instruction could have served would have been to give the jury the opportunity to return a compromise verdict. The court was not required to give it for this purpose. (*State* v. *McGowan, supra.*)

In our opinion, the defendants were properly convicted. Hence the judgment and order in each case must be affirmed.

*Affirmed.*

MR. JUSTICE SANNER and MR. JUSTICE HOLLOWAY concur.