STATE, RESPONDENT, v. WALSH, APPELLANT.

(No. 5,590.)

(Submitted October 31, 1924.  Decided December 23, 1924.)

[232 Pac. 194.]

*Homicide—Confessions—Evidence—Photographs—Attempts to Break Jail—Evidence—Admissibility—Demonstration of Effect of Soft-nosed Bullets—Trial—Exclusion of Witnesses—Discretion.*

Criminal Law—Exclusion of Witness from Courtroom—Discretion.
1. The matter of excluding witnesses from the courtroom is one addressed to the sound legal discretion of the trial court and where no prejudice is shown its refusal to exclude will not be disturbed on appeal; and, generally, officers such as members of the sheriff's force are exempted from the rule permitting exclusion (section 10660, Revised Codes 1921) on the trial of a criminal case.

Homicide—Attempts to Break Jail—Evidence—Admissibility.
2. In a prosecution for murder, testimony relative to a piece of lead pipe torn by defendant from the plumbing in the jail where he was confined and found hidden on his person when transferred to the jail of an adjoining county was properly admitted in connection with evidence touching his attempts to break jail.

Same—Confessions—Admissibility in Evidence.
3. The question of the admissibility of a confession alleged to have been made by defendant while in custody must be determined by the court after hearing evidence in the presence of the jury relative to the circumstances under which it was made, and its finding thereon will not be disturbed unless it is clearly against the weight of the evidence.

Same—Confession Written by Another but Signed by Defendant—Effect of Signing.
4. Where the confession of one charged with murder was taken down in writing but not in his exact words, by signing and adopting the language employed he made it his own.

Same—Photographs of Scene of Crime—When Admissible in Evidence.
5. Photographs of the premises where a shooting occurred were properly admitted in evidence, it having first been clearly shown that the premises were in the same condition when the photographs were taken as when the crime was committed.

2. Admissibility against defendant of document or articles taken from him, see notes in 3 Ann. Cas. 354; 59 L. R. A. 467; 8 L. R. A. (n. s.) 762; 34 L. R. A. (n. s.) 58; L. R. A. 1915B, 834; L. R. A. 1916E, 715.

5. Admissibility of photographs of scene of crime, see note in 51 L. R. A. (n. s.) 856.

[72 Mont. 110.]

Same—Evidence of Attempts to Break Jail—Admissibility.

    6. Evidence of attempts of one charged with murder to break jail is admissible as tending to show consciousness of guilt.

Same—Evidence—Sufficiency.

    7. Evidence, independently of defendant's alleged written confession of murder, *held* sufficient to warrant submission of the case to the jury.

Same—Demonstration of Effect of Soft-nosed Bullets—Discretion.

    8. In a prosecution for murder by shooting, it is within the discretion of the trial court whether it will or will not appoint a person to demonstrate the results obtained by firing soft-nosed bullets from a rifle, and its ruling will not be disturbed on appeal.

*Appeal from District Court, Jefferson County; Lyman H. Bennett, Judge.*

Roy Walsh was convicted of murder in the first degree, and he appeals from the judgment. Affirmed.

*Mr. John Elliott,* for Appellant, submitted a brief and argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Mr. I. W. Choate,* Assistant Attorney General, for the State, submitted a brief; *Mr. C. N. Davidson,* Assistant Attorney General, argued the cause orally.

HONORABLE JOSEPH R. JACKSON, District Judge, sitting in place of MR. JUSTICE RANKIN, disqualified, delivered the opinion of the court.

Defendant, convicted of murder in the first degree and sentenced to hang, appeals from the judgment.

On the night of June 26, 1923, Albert S. Johnson, a storekeeper at Renova, was shot through the throat by someone outside the house; the bullet having gone through the edge of a screen door and also through a closed wooden door before it found its victim. Shortly afterwards Johnson died in a Butte hospital from the effect of the wound.

---

    6. Admissibility of failure of accused to attempt escape, see note in 5 Ann. Cas. 311.

At the trial it developed that there had been no eye-witnesses to the tragedy. After he had been shot, Johnson walked from his store where he lived to a neighbor's house, gurgling and speechless, and by signs indicated his appeal for help. He returned to the store, and lying on the bed, by nods made clear he wanted a doctor; that he did not see his assailant; and that he had been told to throw up his hands.

A dying declaration was made by the wounded man at the Murray Hospital in Butte, reading as follows:

"Q. Do you know who shot you?   A. No.

"Q. Did you see them?   A. Yes.

"Q. You saw one man?   A. Yes.

"Q. You did not know him?   A. No.

"Q. Were they trying to hold you up?   A. Yes.

"Q. You were just bolting or unbolting the door?   A. Yes.

"Q. You heard a noise outside and went to investigate? A. Yes.

"Q. Could you identify the man you did see if he was brought here   A. No."

Sheriff Mountjoy, of Jefferson county, arrived at the Johnson place shortly after the wounded man had been removed for hospital treatment. Some automobile tracks were discerned in the road about 400 yards east of the Johnson store. In the mud these tracks were traced westward to the Yellowstone trail, and, after having notified the sheriff's office at Butte, and giving a description of the tires, the sheriff and his party early on the morning of June 27 traced the tracks to Butte. In that city, at the foot of a street on the east side, and near an old smelter, the car was found abandoned. After having examined the contents, the sheriff's party went to 510 East Park Street, Butte, and arrested one Arthur Hughes and placed him in the Silver Bow county jail. Hughes was questioned as to his whereabouts the preceding night and as to the defendant. He stated that he had been home all night; that he did not know Walsh, and had not seen him for about three weeks. Then, after a long-distance telephone call, Sheriff

Mountjoy left for Jefferson Island, Montana, which is about two and a half miles southwest of Cardwell. There he found armed men searching the country. A Buick car containing, among other things, a 30–30 Marlin rifle, the barrel of which showed it had been recently fired, was discovered in the brush, and some distance away defendant was captured, after he had been seen to crawl from the bottom of a gully and hide himself in the brush. When arrested he declared his name was Mason but admitted he knew Roy Walsh of Butte. On the road going from Jefferson Island to Whitehall the defendant several times denied his identity, but, after having arrived at the latter place, he was recognized by someone in the crowd that had congregated there and admitted that he was Roy Walsh. Defendant related at different times conflicting stories as to his actions, but all of them denying he had been near Renova. He was advised by the county attorney that he was under no threats or promises, and that anything he would say would probably be used against him. The following written statement, signed by the defendant after he had read it over and ordered several changes made in it, was received over objection: ''I am making this statement for the reason that you have told me of Hughes' statement, and since you seem to know most of the facts and will find out the rest of them anyway. Since you know about our camp on Cedar Hill, I will tell you the rest. We got to Butte at about 3 o'clock that morning from Race Track; had breakfast at Hughes.' We talked to Mrs. Hughes, and she told young Hughes that they were after him for the theft of the Cadillac car and she wanted him to stay. He said there was no time for him to be stopping if they were after him. We had breakfast, and left there about a quarter to 4. We got to Cedar Hill about 5 or 6 o'clock in the morning and camped there. We left there after dark, probably 8:30, for Renova. It was our intention to hold up Johnson personally for the money he keeps there. It was my intention to go to Seattle. Hughes did not want to leave for fear they would catch him

at some city like Missoula on the way. He wanted to kill a week or two up the Madison until the pursuit died down for the Cadillac, so we decided to hold up Johnson for provisions and money to keep up until we could leave for Seattle. We had no definite plans, but planned to hang around the store until Johnson was alone and then stick him up. Hughes suggested that we lie in a ditch on the other side of the box-car. I stated, 'No, there is no use lying in the ditch; if we have got to do it, let's do it and have it over with.' I didn't want to hurt Johnson, but supposed we would have to tie him. That was our intention. Hughes said that he would hold Johnson up with the six-shooter or 32 that he had. I would walk in after him and tie Johnson up. We would then take what provisions we needed and some money, and then hit for the Madison. The reason for having Hughes hold him up was that he would recognize me better than Hughes on account of my size. We were both to wear masks. Hughes was to walk in, hold Johnson up, make him turn around so that he could not see me when I came in, and we were to tie him up. When we left Cedar Hill Hughes went ahead, backed in on the spur near the loading platform not far from the bridge at Renova, and waited for me. I drove my car after him, but instead of turning in to go into the store at Renova I continued down along the lane leading straight to the main track. This was perhaps a quarter after 9 in the evening. *Hughes came to my car after me.* We left my car there, and went over along the spur to where the Cadillac *was.* Hughes said he had been waiting for quite a while, and wanted to know what was wrong. I told him there was nothing the matter. I had been trying to fix the flashlight, but the bulb was broken so that we couldn't use it. I said, 'Oh, well, Johnson might have some flash-lights in there.' We were in the Cadillac car for maybe half an hour. The car was parked some distance from the main road, maybe sixty feet. We masked up with parts of an old white shirt of Hughes in the Cadillac. We then went out in front of the store, and we

went around between the store and the track on the west side of
the store. We got to the walk that runs out from the store to
the track. There was a man there talking to Johnson. I
didn't know him. Johnson was sitting on the counter talking
to him until he left. Then we saw the other fellow leave, and
Johnson got off the counter, took the money out of the cash
register, and counted it. We couldn't see him after that. He
evidently went into the back room. We both sat down in the
brush then for a while, perhaps three minutes. Then we got
up, went over alongside the store on the track side, and climbed
over the board gate. Hughes stayed by the door that opens
on the walk to the track. I went around to the other side of
the store. Hughes was supposed to watch one side while
I watched the other so that one of us would get Johnson
whichever way he went. When I got there, and when I got
around to the other side, Johnson was trying the middle door
on that side, the one forward of his bedroom door. I heard
him rattle the door-knob. *I ducked back and made a little noise.*
When I got to the bedroom door Johnson was in the bedroom.
When I got up past the bedroom door I ran into a box by the
fence. The fence is about eight feet from the store, the box
was against the fence, and had some tin strips on it. The
box was at my *left* and the vines next to Johnson's bedroom
door were at my right. I was trying to go between the vines
and the box. I hit the *box* with the gun and with my leg.
Johnson opened the door and looked out. I crouched down
by the vines with the gun in my right hand, started to beat it,
and the gun caught in something and went off. It probably
caught in the vines or in the strings. After the gun went off I
went over the fence and ran to the spur-track and back along
the spur-track to the Buick. It may have been five minutes
between the firing of the shot and the time I started the Buick
car. When the gun went off there was a light in Johnson's
bedroom. When I got back to the Buick I saw the tail light
of an automobile going west along the main road to Whitehall.
I know that it wasn't *the* Cadillac, *because I had disconnected*

*the tail light.* I started the Buick, went up the lane to the main road, and around the main road, past the store, across the bridge, and up the hill on Parrott Bench. As I went past the store I noticed the lights still on in Johnson's room. There was also a light in the house across the road. No promise has been made to me. I have made this statement not because of any promises that were made to me, and I am telling these things because I know that you would find them out anyway, having learned about our camps and having got information from Hughes. I have not been threatened, and am not making this statement or any part of it under threats or promises, but make them of my own free will and because I think it will all be found out anyway. I did not know that Johnson had been hurt *when I left. I know this statement may be used against me.*

"Roy W. Walsh."

"Subscribed and sworn to before me this 30th day of June, 1913.

"Howard A. Johnson,

"Notary Public for the State of Montana, Residing at Boulder, Mont.

"My commission expires June 21, 1926."

Many photographs were introduced showing the premises at different angles and likewise the bullet hole in the doors. On the wall of the house on the side which contained the doors through which the shot was fired was the growth of hop vines, and the box spoken of in defendant's written statement was a short distance away from the wall, and almost opposite the door.

While incarcerated in the county jail at Boulder, the defendant tore up the plumbing in the jail, broke off a piece of pipe, ripped some scrap iron from one of the bunks, and broke the chain that supported the bunk. The piece of pipe was found on defendant when he was searched in the Silver Bow county jail, where he was kept as a matter of accommodation

to Sheriff Mountjoy. It was hidden in the leg of defendant's overalls and fastened by a piece of string.

Defendant assumed the stand on his own behalf. During the course of his examination he said that he had told the sheriff that he had been up the Madison country and that he had made a confession to Mr. Johnson, the county attorney, but also declared that some of the things contained in the confession he did not state. He said he could not state whether he was present at the Johnson store at the time Mr. Johnson was shot; that he and Hughes had intended to hold up Johnson, but that he decided he would not take part in the crime, but that he walked along the east side of the building and peered through the window, with a gun in his hand; that Johnson came to the door, and the defendant became panic stricken, and in endeavoring to get away he climbed over the fence and went back to his car; that he heard the report of no gun; and that, if the gun had been discharged, he would have known it. He stated the reason that he hid his Buick car and also himself was because he thought the car might have been stolen. He admits that some of the interlineations on his confession were made at his suggestion, but denies that he was familiar with all of the things mentioned in the confession.

Much evidence was received by both sides with respect to the effect of a soft-nosed metal patch 30–30 bullet penetrating the screen door and the wooden door as to whether or not the metal jacket would leave the lead projectile.

There are several assignments of error, upon none of which [1] may be predicated prejudicial error. The court refused to exclude from the courtroom during the trial the state's witnesses Mountjoy and Knight. Section 10660, Revised Codes of 1921, provides: "If either party requires it, the judge may exclude from the court room any witness of the adverse party, not at the time under examination, so that he may not hear the testimony of other witnesses." This provision is addressed to the sound legal discretion of the trial court, and, where no prejudice is shown, the action will not be disturbed. The

rule is well stated in 16 C. J. 841, 842: "It is within the discretion of the court whether or not it will exclude witnesses from the courtroom during the trial. In accordance with the above rule the question what witnesses may be exempted from the operation of the rule when invoked, rests in the discretion of the court. * * * Persons whom the court usually exempts from the operation of the rule are attorneys of the court; court officers who happen to be witnesses, and whose attendance in the courtroom is necessary; a detective or officer assisting in preparing the case for prosecution." Undoubtedly the witnesses Mountjoy and Knight, being members of the sheriff's office, were properly exempted from the rule, but in any event it was all within the discretion of the trial court.

Another assignment of error is with respect to the testimony [2] concerning the piece of pipe which had been taken from the person of the defendant. In connection with the evidence concerning the defendant's attempts to break jail it was clearly admissible.

Another assignment of error relates to the testimony of Sheriff Mountjoy and the witness Knight on the all-embracing ground that the testimony is based on hearsay evidence and conjectures derived from statements they heard. The assignment is utterly without merit, and will receive no consideration by this court.

The only specification of error which seems to have serious [3] reliance placed upon it by the defendant, and the only one in support of which any authority is cited, relates to the admission of the confession made by Roy Walsh in the presence of the sheriff, his deputy, and the county attorney, in which the accused admitted the commission of the crime with which he is charged. It was a written statement taken down by the county attorney, afterwards written out by him, signed by Walsh, and sworn to before the county attorney. Much cross-examination was had during the trial as to whether any inducements were held out or threats made to the defendant or as

to the voluntary character of the declarations contained in the confession.

The subject of confession has been repeatedly passed on by this court, and the rules governing their admissibility have been clearly stated in *State* v. *Berberick,* 38 Mont. 423, 16 Ann. Cas. 1077, 100 Pac. 209, *State* v. *Guie,* 56 Mont. 485, 186 Pac. 329, and *State* v. *Stevens,* 60 Mont. 390, 199 Pac. 256. In the latter case the court defines a confession as follows: "A 'confession' is an acknowledgment in express terms, by a party in a criminal case, of his guilt of the crime charged."

In *State* v. *Berberick, supra,* this court held: "The question of the admissibility of a confession alleged to have been made by defendant while in custody is one to be determined by the court after ·hearing evidence, in the presence of the jury, relative to the circumstances under ·which it was made, and its finding thereon will not be disturbed on appeal, unless clearly against the weight of the evidence." In the same [4] case the court held that, where a confession was taken down in writing but not in the exact words of the defendant, he, by signing it and adopting the language employed, made it his own. The cases cited in appellant's brief are without merit on this point, and will be passed without comment.

The specification of error relating to the introduction and [5] identification of photographs is worthless, for the reason that it is clearly and indisputably shown that the premises were in the same condition at the time of the tragedy as when the photographs were taken, a few days later.

It is urged that the testimony regarding the conduct of the [6] prisoner while in jail is error. The evidence was clearly admissible as tending to show consciousness of guilt. (16 C. J. 554; 2 Wharton on Criminal Evidence, 10th ed., p. 497.) How- [7] ever, there is no question in the minds of this court but that, aside from the confession of the defendant, there was sufficient evidence in this case to warrant its submission to a jury and to justify its verdict. Here is the evidence, excluding the confession: Johnson was killed by a soft-nosed bullet fired

from a high-powered rifle. A 30–30 Marlin rifle, recently fired, loaded with soft-nosed bullets, is found in a Buick automobile hidden in the brush, which automobile the defendant admits he had been driving, and says, ''It was supposed to be a stolen car.'' The accused is captured about a mile from the car, hiding in the brush, on the morning following the shooting. On being arrested he states that his name is Mason, but later admits it is Walsh. He tells a false story as to his whereabouts at the time of the shooting, and he attempts to break jail; later admits owning a rifle; on the witness-stand admits he was at Johnson's store the night of the homicide, and testifies that he was there with the intention of holding Johnson up, and that he had a gun. This we feel would amply justify the submission of the case to the jury.

The trial court was under no duty to appoint a person to [8] demonstrate the results obtained from shooting soft-nosed bullets. It was entirely within the discretion of the court, and its ruling will not be disturbed. The vagaries of missiles from firearms, after having struck or penetrated objects, are of such a generally known character that it is next to an impossibility to determine what will happen to the projectile after it has left the muzzle of the firearm.

The judgment is accordingly affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY, ASSOCIATE JUSTICES HOLLOWAY and STARK, and HONORABLE FRANK P. LEIPER, District Judge, sitting in place of MR. JUSTICE GALEN, absent on account of illness, concur.

Rehearing denied January 8, 1925.