STATE, Respondent, *v.* GAFFNEY, Appellant.

(No. 7,761.)

(Submitted February 24, 1938.   Decided March 10, 1938.)

[77 Pac. (2d) 398.]

*Mr. D. L. O'Hern,* for Appellant, submitted an original and a supplemental brief; *Mr. Hugh J. Lemire,* of counsel, argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. Carl N. Thompson,* Assistant Attorney General, and *Mr. W. R. Flachsenhar,* County Attorney of Prairie County, for Respondent, submitted a brief; *Mr. Flachsenhar* argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

Leslie L. Gaffney was convicted of an attempt to commit arson in Prairie county and sentenced to the state prison. The appeal is from the judgment and is predicated upon four assignments of error, which raise the following questions: (1) Did the court err in requiring defendant to go to trial upon the amended information? (2) Does the evidence in the record contain independent facts and circumstances sufficient to corroborate the testimony of Harold A. Sayer, confessed accomplice in the attempted arson?

The information as amended charged as follows: "The said Leslie L. Gaffney on the 18th day of October, 1936, * * * did, in the night-time of said day, unlawfully, feloniously, wilfully and maliciously attempt to burn a certain inhabited frame building, * * * in which said building there were at said times human beings, * * * with intent by the said defendant then and there to *set fire to, burn and destroy said building, by placing several receptacles containing kerosene, gasoline, and other inflammatory materials and scattering the same on*

*the bed and about the rooms of the second floor of said building.* * * * * ''

The italicized portions indicate the amendment which was made by interlineation at the time of trial. Notice of the proposed amendment was served on defendant and his counsel ten days prior to day of trial. The court took the position that the amendment was one of substance requiring rearraignment. On rearraignment defendant again pleaded not guilty, and the trial proceeded over the objection that he was not prepared for trial on the amended information.

Defendant insists that after the information was amended as to a matter of substance, he was entitled to at least two days in which to prepare for trial by virtue of section 11935, Revised Codes, which provides: ''After his plea, the defendant is entitled to at least two days to prepare for trial.'' The force of defendant's contention based on this statute loses much of its effect in the face of the record showing that he had been given ten days' notice of the state's intention to move that the amendment be made. However, there is yet a further reason why the contention is without merit, and that is that we believe the original information was sufficient without the amendment. The amendment added nothing more than could have been obtained by the defendant in a bill of particulars, which any defendant may obtain. (*State* v. *Stevens,* 104 Mont. 189, 65 Pac. (2d) 612, and cases therein cited.)

Technically speaking, defendant, having been required to plead again, ordinarily should have been allowed the statutory minimum of two days in which to prepare for trial (section 11935, supra), but here the amendment was not necessary, nor was the rearraignment, which facts made the defendant's position different from that of a defendant entering his plea for the first time. In any event, the defendant's rights were in no way prejudiced by the amendment after the ten days' notice which he had been given. If he could not prepare a defense in ten days, it was unlikely that he could have done so in the two additional days. What was said in *State* v. *Stevens,* supra, on the question of sufficiency of the information is applicable

here.  See, also, *State* v. *Shannon,* 95 Mont. 280, 26 Pac. (2d) 360, for related matter and the modern trend in criminal procedure.

We are not impressed with the contention that defendant was ▮ prejudiced by the endorsement of the additional names on the information the morning of the trial.  Ten days' notice of three of these names had been given.  Of the remaining seven, only four testified.  Section 11805, Revised Codes, provides: "The county attorney must endorse upon the information at the time of filing the same, the names of the witnesses for the state, if known."  The record shows affirmatively that the county attorney conformed to the command of the statute, both in letter and spirit.  There is no showing that he knew at the time of filing the information that any of the additional seven would be material witnesses.  (See *State* v. *McDonald,* 51 Mont. 1, 6, 149 Pac. 279; *State* v. *Akers,* ante, p. 43, 74 Pac. (2d) 1138, 1143.)

The determinative question is as to the existence of corroborative ▮ tive evidence sufficient to sustain the judgment.  We enter upon a consideration of the evidence guided by the controlling statute, section 11988, Revised Codes, and with the settled constructions of its meaning in mind, as set forth in *State* v. *Bolton,* 65 Mont. 74, 212 Pac. 504, and *State* v. *Jones,* 95 Mont. 317, 26 Pac. (2d) 341, and recently reviewed and approved in *State* v. *Akers,* supra.  The statute provides as follows: "A conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof."

In order that the discussion of the evidence may be more easily understood, a few facts should be mentioned in addition to those set out in the information.  The building described was, at the time of the attempted arson, an asset of the estate of defendant's deceased mother.  Defendant was administrator of

the estate and sole heir thereto. The building was insured for the sum of $3,000.

The testimony of Harold A. Sayer, confessed accomplice, a witness called by the state, was substantially as follows: He testified that he had known defendant for six or seven years but not intimately; that he had never had any business dealings with him; that he himself was living in Red Lodge at the time of the attempted arson and had been residing there for two years; that prior to that time he lived in Billings, where he was acquainted with defendant; that he was not personally familiar with the Gaffney building in Terry, the object of the attempted arson, prior to his visit to it the night he made the attempt to burn it, but that he had been in Terry before and "knew his way around."

He said that defendant had conversed with him about the building at Red Lodge in July, 1936, and at that time told him, "He had this old rattle-trap building about ready to fall down and which he would like to get rid of because it wasn't paying him anything." Sayer said he was interested and agreed to burn it down for 10 per cent. of the entire proceeds of the insurance. He said these negotiations occurred at the first meeting between the parties in Red Lodge in July, 1936; that in September of that year defendant called at his home and took him for a short ride and told him "any time I wanted to come down to Terry it would be all right, and that the place was all ready to burn." He said that defendant then drew a map for his guidance. This map was on a piece of paper on one side of which there appeared a rough drawing of the streets and alleys and certain buildings in Terry, showing the Gaffney building with a big boot on the front of it. The ground floor of the building was at the time occupied by a shoemaker, and the boot was his sign. On the reverse side of the paper was a rough drawing of the interior of the building—particularly the upper floor. This map was later found on the person of Sayer shortly after the fire when he was arrested in Miles City. He testified that he made the trip to Terry on the evening of October 18, 1936, in the company of one Gene Sproul, a friend

whom he had picked up at Billings and who merely went along because Sayer had asked him to go; however, he knew the object of the trip.

Sayer supplied himself with kerosene and excelsior with which to facilitate the starting of the fire. He arrived at Terry at about 11:30 P. M., and located the building by means of the map. He and his companion then went upstairs by an outside stairway, and scattered kerosene and excelsior about in preparation for the burning. He explained that the occupants on the ground floor were attracted by the noise and "hollered" and frightened them away. This part of the testimony was corroborated by the shoemaker and his wife. They then drove toward Miles City. Just as they entered the town of Miles City, they were arrested on notice given the sheriff of Custer county by the sheriff of Prairie county. Shortly after the arrest, the parties were searched and some member of the sheriff's force took the map from Sayer's pocket.

Sayer testified that the next time he saw defendant was in Helena at the Harvey Hotel, in November, 1936. He said he went there at the solicitation of one Waugh, an insurance investigator, and on the advice of his own attorney. He said his sole purpose in going to Helena was to satisfy Waugh that defendant would recognize him. He explained that a room was procured for him at the Harvey Hotel; that he was directed by Waugh and one Parsons, deputy state fire marshal, to contact defendant who had a room at the same hotel. He made several attempts to 'phone him, but was informed each time that he had company and could not see him just then. He tried to get defendant to come to his room, but did not succeed; that finally defendant asked him to come on down to his room, which he did; that when he arrived there he was introduced to two of defendant's friends, Kibler and Downs. He said he did not remember whether defendant greeted him by his name, but that there was no question but what he immediately recognized him. Sayer said that he knew that Parsons and Waugh left his room at the same time that he did, but that he did not know they were in the hallway when he went into defend-

ant's room, he did not know where they had "parked themselves." He understood that the only reason he was sent to Helena was to see if defendant would recognize him, and doubted that he would have come had he known that Parsons and Waugh intended to "eavesdrop and listen around." He was told that the friends knew about the affair in Terry so he could go ahead and talk. He conversed with defendant with relation to the attempted burning and told him "he had gotten into trouble down here [Terry?] and needed some help." Defendant told him he would do what he could. Later on in the evening he again called on defendant in his room, and was there seen by Parsons and Waugh who entered and found him with defendant.

The state called Parsons, the deputy state fire marshal, and Waugh, special insurance company investigator. Parsons testified, in substance: That he first called on defendant in his room at the Harvey Hotel on November 23, 1936, in company with Waugh. After introducing himself in his official capacity, he told defendant that he wished to talk to him concerning the attempt to burn his building. Defendant said that he did not know the men that had been arrested, but stated, with regard to Sayer, that he had heard the name "Sayer or Sawyer" but did not know the party in question. He denied ever having had any contact with Sayer in Red Lodge on any matter. He asked defendant to draw a plan or rough sketch of the upstairs of the building, which he did, lettering the rooms as to whether a bedroom, kitchen, stairs, etc. This diagram was later admitted in evidence. Defendant told him he carried $3,000 worth of insurance on the building; that he had talked to the sheriff of Prairie county, but had not contacted the county attorney. He said that, inasmuch as there was no damage, he did not think much about it.

Parsons then corroborated Sayer with regard to the plan entered into between Sayer, Waugh, and himself to discover whether defendant would know Sayer, this because defendant had told Parsons on his first visit he did not know him. In addition, Parsons stated that he followed Sayer to defendant's

room, and as Sayer entered heard defendant say, "Hello Harold." Defendant corroborated Parsons as to this salutation. After momentary confusion of introductions and the rattling of ice in glasses, he heard defendant say, "You can go ahead and talk; these men know all about it"; and also, "We got in it together, we will get out of it together." The transom above defendant's door was open. Parsons further testified that later on that evening he again followed Sayer to defendant's room in company with Waugh. The two were concealed in a linen closet directly opposite to defendant's room. Defendant came to the door, turned off the room lights, and told Sayer he was going to look to see if anyone was listening. At that time Waugh and he entered the room and found Sayer there. Parsons said to defendant, "I thought you didn't know Harold Sayer?" His answer was, "How do you know I do?" Defendant then turned to Sayer and asked, "Did you tell them that I knew you?" "Yes," replied Sayer, and defendant then said, "I guess it is all right."

Waugh substantially corroborated Parsons. However, he did not say he heard the statements made in the room during the "eavesdropping" because, as indicated by Parsons on cross-examination, he was stationed at a different point in the hallway for the purpose of giving Parsons the signal or "high sign" if other guests came along. He differed with Parsons as to the transom being open, but said it did not fit tightly and that he had seen the light from the room shine through the opening. He supplemented Parsons as to the following conversation with defendant on finding Sayer in the room. He asked defendant, "Well, what are you doing with this man in your room? This is the man that attempted to set fire to your place?" He then stated that after that defendant refused to answer all questions.

Defendant's cousin, testifying in behalf of the state, corroborated Sayer as to the second trip made by defendant to Red Lodge, as did Sayer's wife. The latter, however, testified in addition that she had been acquainted with defendant for about five years; that she had seen him call for and pick up her husband and take him for a short ride; however, she made no

attempt to corroborate him with regard to plans for the proposed burning. She was not cross-examined.

The undersheriff, who assisted in apprehending Sayer and Sproul, corroborated Sayer in the matter of finding the map, assertedly drawn by defendant, at the time of his arrest. The remainder of the state's evidence related for the main part to the commission of the offense or circumstances thereof, and will only be referred to incidentally where it may have some bearing on the corroboration required by statute.

Defendant took the witness-stand in his own behalf and attempted to explain away the suspicious and incriminating circumstances regarding his associations with Sayer brought out in the state's case. He admitted that the building involved was insured in the sum of $3,000, and that it was part of his mother's estate for which he was the acting administrator and sole heir. The state contends that his negative actions when considered with the other facts and circumstances of the case, show sufficient corroboration to connect him with the commission of the offense charged. He confessed six years' acquaintanceship with Sayer immediately prior to the attempted burning, thereby corroborating Sayer to that extent. This was in direct contradiction to what both Parsons and Waugh testified with relation to their first conversation with defendant and his denial of acquaintance with Sayer. It was, however, in accord with what these two witnesses testified to in connection with their second visit to defendant's room—namely, that he admitted knowing Sayer when he was found with him in his room. He admitted drawing the map for Parsons and Waugh, but denied any knowledge of the similar map found on Sayer. He would not admit that the latter was a good diagram of the upstairs part of his building. Both diagrams went to the jury for consideration. An examination of both discloses basis for belief that they were drawn by the same person—the defendant. There was obvious similarity in general appearance as well as in the details as to the arrangement of rooms, doorways, and staircase. Such familiarity with the plan of the building was certainly possessed by defendant, but the record does not

bear out very forcefully such conclusion as to Sayer or anyone else here involved.

Defendant testified that Sayer had approached him in 1933 in Terry in the Gaffney building and had suggested that, "It [the building] would be better off burned down." He said no "deal" was made at that time about Sayer's burning it. The only corroboration of any such occurrence was that of Downs, who testified that defendant had mentioned this 1933 event in the latter's room at the Harvey Hotel just before the occasion of Sayer's visit. Defendant did not think there was anything unusually strange about Sayer's inquiry at that time, and that even after he had read the account of the attempted arson in the "Terry Tribune," he did not recall or connect Sayer and the occurrence of 1933 with the crime. He made no mention to the authorities at that time or later as to this asserted conversation with Sayer.

Defendant went to Terry approximately two weeks after the crime was committed, and his conduct at that time with relation to the attempt was peculiar and indifferent for a man whose building had narrowly escaped being burned. Previous to this trip he had not called or written anyone in Terry about the matter. He contacted the town marshal and asked him who did it, and when he could not remember one of the names, defendant said it did not make any particular difference. To like effect was the testimony of the Prairie county sheriff. When that officer could not think of the names, defendant told him it did not make any difference, that he had seen their names in the paper.

Defendant testified that he had read the account of the attempted burning in the "Terry Tribune" possibly the weekend after the fire, and that was prior to his visit to Terry and the conversations with the two witnesses just mentioned. The paper is an exhibit, and a casual reading of the account discloses exactly the information that defendant was attempting to elicit from the local officers. The indication therefrom is justified that his inquiries were much in the nature of a "fishing expedition" to find out who else might be suspected.

Equally strange and inconsistent with the idea of innocence seems the apparent lack of interest displayed by defendant over the entire period involved in the case. At no time did he visit the upstairs of the building in which the attempt was made; at no time did he take any affirmative action or steps such as would be expected of one whose building had been threatened by fire; he volunteered no information but was willing to wait until called upon. Here is his testimony: "When my own property had been attempted to be destroyed, I imagine it would have been my duty to assist them when the trial came, or it was necessary to testify. I didn't think when they [Parsons and Waugh?] came to Helena, that I should disclose it to them—and I had a reason. I didn't think it was better to conceal it from them; I concealed it from them for a purpose. I answered the questions they asked; I answered what they asked me, that was all—I didn't volunteer anything. All the information that I would give them was what they 'dug' out of me, you bet it was!" When Sayer called on him at Helena, he was treated with all the friendliness and hospitality of an old friend, rather than being remonstrated with or abused for his attempted deed. He was offered a "drink"; introduced to defendant's friends, and told to go ahead and talk—he was among friends. He corroborated Sayer as to the latter's statement that he was "in trouble" and, in addition, testified that he surmised what that trouble was from the newspaper account of the attempted burning. In addition to this, defendant testified that he gave Sayer $10 on his first visit to the room, and he did not think that "kind of peculiar, when a man tried to burn my [his] building." He gave the money, he said, because Sayer was hungry and "broke," but this explanation seems somewhat inconsistent with the fact that Waugh, for whose accommodation and at whose solicitation Sayer came to Helena, said he paid for Sayer's room and "feed."

Defendant admitted each of the two trips to Red Lodge testified to by Sayer, but gave elaborate and detailed explanations as to why he happened to contact Sayer each time. The jury had ample ground for disbelieving such explanations in the

face of the unequivocal denials made by defendant to the officers as to any acquaintanceship or previous contacts with Sayer.

Viewing the record as a whole, as we must, the facts and circumstances of the case, augmented and borne out by direct testimony, point glaringly and unmistakably toward defendant, sufficiently, at least, to more than "tend to connect" him with the crime. The jury had the right to believe or disbelieve the state's witnesses, and, as recently announced in *State* v. *Akers*, supra, "After there has been the necessary corroboration of the testimony of an accomplice, the jury may then weigh the entire testimony of the accomplice in order to determine the guilt of the defendant." (See, also, *State* v. *Bolton*, supra.)

After the essential corroboration was furnished tending to connect defendant with the commission of the crime, the whole testimony, including that given by Sayer, presented a case for the jury. The verdict did not depend entirely upon the testimony of the accomplice, and should not be disturbed.

Affirmed.

MR. CHIEF JUSTICE SANDS and ASSOCIATE JUSTICES ANDERSON, MORRIS and ANGSTMAN concur.