THE STATE OF MONTANA, Plaintiff and Respondent, v. LAURENCE A. McLEOD, Defendant and Appellant.

No. 9718.

311 Pac. (2d) 400.

Submitted February 27, 1957. Decided May 9, 1957.

480

Mr. Edward T. Dussault, Missoula, for appellant.

Mr. Arnold H. Olsen, former Atty. Gen., Mr. Forrest H. Anderson, Atty. Gen., Mr. Louis Forsell, Mr. Gordon R. Bennett, Asst. Attys. Gen., Mr. J. A. Turnage, County Atty., Polson, for respondent.

Mr. Dussault, Mr. Forsell and Mr. Turnage argued orally.

MR. JUSTICE BOTTOMLY:

This is an appeal by defendant, Laurence A. McLeod, from the judgment of conviction of assault in the first degree, and the order denying defendant's motion for a new trial.

An information was filed, on April 16, 1956, in the district court of the fourth judicial district of the State of Montana, in and for the County of Lake, by the county attorney thereof, charging the defendant with the crime of assault in the first degree, and therein attempting to charge defendant with prior convictions.

April 24, 1956, a demurrer was filed by defendant's attorney challenging the sufficiency of the information, and on the same day the demurrer was argued and by the court sustained.

The court granted time to the county attorney to file an amended information, which amended information was duly filed and served the same day, April 24, 1956. A demurrer thereto was argued and denied by the court. The defendant, by his counsel, stated he was ready to plead, at which time he was arraigned and entered his plea of "not guilty."

The court then set the case for trial on May 7, 1956, and set the bail bond at $25,000. Defendant's attorney made a formal request for reduction of bail to $10,000. The request was denied by the court.

May 1, 1956, defendant moved the court to vacate the setting of the trial of the cause on May 7, 1956, and to continue the same over the jury term commencing May 7, 1956. In support of his motion, affidavits of defendant and his attorney were filed, which affidavits, *inter alia*, recited that defendant is in jail, not able to furnish the bail bond and cannot assist his counsel; that there are witnesses on the information that are not known to affiants and are scattered over a large territory; that attorney for defendant is engaged in preparation of defense in trials in Missoula, and that he has private matters which need his attention, making it impossible for him to prepare the defense for defendant if said trial is had during the term of court commencing May 7, 1956.

On May 1, 1956, the motion for continuance was argued. The defendant, by his counsel, waived the statutory time in which to bring the matter to trial; and the court denied the motion for continuance.

It was then made known to the court that the victim of the alleged assault, Thomas Edward Pablo, was improving and apparently would live. The court then ordered the bail bond to be reduced to the sum of $7,500.

May 7, 1956, the cause came on regularly for trial at which time the county attorney moved the court for leave to endorse three additional witnesses' names to the information. Objection was interposed by defendant's attorney; the court granted the motion and directed the clerk of the court to endorse the three names on the information.

Defense then stated they were ready to proceed with the trial, and defendant by his counsel then moved to dismiss the amended information for the reasons stated in his motion. The court denied the motion. Defendant by his counsel then moved for exclusion of witnesses, which motion was also denied by the court.

Trial was had, the jury found the defendant guilty of assault in the first degree, and left his punishment to be fixed by the court. The court imposed sentence by imprisonment in the state prison for a term of eighteen years.

This prosecution arose out of the following facts and circumstances:

The state's witness, Roy J. Kuntz, testified, *inter alia*, as follows: That he resided at St. Ignatius, was in the Mint Bar at Ronan on April 10, 1956; that he was acquainted with the defendant, Laurence A. McLeod, whom he met there in the Mint Bar, and also present in the bar were Alice Curley and Lucy Pluffe.

The witness Kuntz had his 1950 Chevrolet car, which was light and dark green in color. About 2:30 or 3:00 p. m., Kuntz, the defendant, Laurence A. McLeod, and the two girls, Lucy Pluffe and Alice Curley, left Ronan for Polson in Kuntz' Chevrolet. The defendant had a truck which he parked at the Valley Club before leaving Ronan with Kuntz and the girls. At this time, defendant removed a gun from his truck which he took with him in Kuntz' car to Polson.

The witness Kuntz identified state's exhibit four as the gun or pistol defendant took from the truck and carried to Polson. The gun was in the glove compartment at one time and also in the back of the Kuntz car. After Kuntz, McLeod and the girls arrived at Polson, and before Kuntz and McLeod went into the Turf Bar, Kuntz handed the gun to McLeod, which was removed from the back window ledge of his Chevrolet.

After leaving Ronan and on their arrival at Polson, the four were together off and on until about 11:00 p. m., the evening of April 10, 1956. They visited different bars and wound up at the Turf Bar about 11:00 that night. There were several people present in the Turf Bar at that time, and there was a great deal of talking and arguing. Among those present in the Turf at that time were Roy J. Kuntz, the defendant, Laurence A. McLeod, Alfred Roullier, Thomas Edward Pablo, Dennie J. Harrington, Richard Couture, Donald Grant, Alice Curley, Marlin Noble, cook in the Turf kitchen, and Irene Morengo, barmaid in the Turf Bar.

Kuntz and McLeod were arguing first with Alice Curley and then with Thomas E. Pablo. No one seemed to know what they were arguing about other than Kuntz kept insisting he wanted to fight Pablo. Irene Morengo called the cook, Marlin Noble, and the group was ordered out of the bar. The crowd then proceed to the alley where Kuntz started fighting with Pablo whom he knocked down. Richard Couture, a returned war veteran, started to help Pablo up, at which time Kuntz then began fighting Couture. Kuntz then called out, ''Get the gun,'' or ''Get the gun and shoot him.'' McLeod produced a gun and shot Pablo who slumped down, and as he did so, McLeod shot him again. He then swung his gun, which was an automatic, on the crowd and said: ''If anyone else wants any of this, step out,'' or words to that effect. Kuntz and McLeod then ran down the alley; Pablo was taken at once to the hospital by Couture and others, and Dr. Ward E. Benkelman was summoned.

Dr. Benkleman testified, *inter alia*, that when he reached the hospital, Pablo was in shock; he had two or three wounds from

which the blood was spurting; that he was placed in surgery and given dextrose; that he had two bullet wounds, one below the xiphoid process at the pit of the gut, the other below and a little to the outside of the right nipple, and that there was a hole below the shoulder blade where it appeared a bullet had passed out. The posterior wounds were bleeding the most. Two missiles had gone completely through the body, one had pierced the lower lobe of the liver, causing a large laceration. The loose pieces of the liver were cleaned out, and a large piece of liver that was hanging down was sutured back in place, and the whole area was cleaned out.

Dr. Benkelman further testified that the reason for the exploratory operation was to determine if there was any perforation in the gut; that one of the bullets had gone through the lung and the hemorrhage was profuse; that Pablo was his patient and he was of the opinion that his presence at the trial might endanger his life as he had been running a high temperature and he was worried about it; that an abscess which had formed at the exit of one of the bullet wounds had broken and was draining; that infection might develop that would endanger his life, and that he believed it would be a gamble for Pablo to attend the trial.

One of the states witnesses was Donald Grant who testified, *inter alia,* that he was a married man majoring in economics at Bozeman during the winter quarter; that he was in the Model Bar at Polson the evening of April 10, 1956, where he met the defendant McLeod; that he had a conversation with him, at which time he told Grant he had a gun and if anybody fooled with him he wasn't afraid to use it. Later that evening, about 11:00 o'clock, Grant was in the Turf Bar and talked to Alfred Roullier, an employee of J. Neils Lumber Co., and also to Dennie J. Harrington. Grant further testified that Kuntz, McLeod and Pablo were also there when the argument started; that Kuntz wanted to fight Pablo, and that about that time he and everyone went out into the alley to witness the fight that was brewing; that when he reached the alley Kuntz and Pablo were

fighting; that Kuntz knocked Pablo down; Kuntz then started fighting with Couture; that he heard a shot, turned around and saw that McLeod had a gun which he fired again, hitting Pablo; that Pablo cried out that he had been hit and sank to the ground. McLeod then pointed the gun around and asked "If anybody else wanted any of this?" He further stated that Kuntz and McLeod then took off down the alley and Couture took Pablo to the hospital. The state's witnesses, Alfred Roullier and Dennie J. Harrington, testified substantially to the same facts.

Charles P. Cole, witness for the state, testified, *inter alia,* that he lives at Pablo, Montana; that around midnight or shortly thereafter on April 10, 1956, he was in the Mint Bar in Ronan, Montana; that he was talking to the bartender when the defendant McLeod and Kuntz came in. Cole stated: "McLeod wanted me to give him $5.00 and I said I didn't have any money on me and asked him what was wrong, and he said 'I just shot a man.' I didn't know whether it was true or not."

Victor Dale Warren, bartender at the Mint Bar in Ronan, also testified, *inter alia,* that about midnight of April 10, 1956, while he was tending bar, the defendant Laurence A. McLeod came into the Mint and "asked me to loan him some money. I told him I couldn't loan him any. * * * He said he had to get out of town because he had been in a shooting scrape." He also testified that Kuntz was in the bar with defendant.

Joe Day, deputy sheriff of Missoula County, testified, *inter alia,* that he had been alerted with regard to the alleged shooting, and had been informed that the defendant McLeod was suspected as the perpetrator thereof; that McLeod had left Ronan in a 1950 model Chevrolet car headed toward Missoula. Day then alerted the highway patrol and in the early hours of April 11, 1956, a road block to stop the automobile was set up by the highway patrol at the port of entry, west of Missoula. Day then proceeded up the highway going toward Ronan. At Evaro he spotted the said automobile which was traveling toward Missoula. Day followed the car to the port of entry where the car

was stopped by patrolman E. D. Allen, in the presence of deputy Day.

Allen testified that the defendant was driving the automobile; that he came out from behind the wheel with his hands up, and said "I'm clean" and was arrested. In the automobile with defendant was Kuntz and the woman Pluffe. Allen then took from the glove compartment of said Chevrolet a Beretta automatic pistol, caliber .380. Allen turned this automatic over to Joe Day, and each scratched his mark on it. This pistol was identified at the trial by Kuntz as the gun or pistol the defendant had taken from his truck on April 10, 1956, at Ronan and placed in Kuntz' Chevrolet before they went to Polson. Kuntz also identified it as the pistol or revolver he had handed to defendant before they went into the Turf Bar in Polson the evening of April 10, 1956. At the time of the arrest of defendant by Allen, he found that the Beretta automatic pistol was cocked, had a live shell in the firing chamber, and live ammunition in the clip.

Francis R. Kis, a policeman of the city of Polson, testified, *inter alia,* that he heard the two shots fired the night of April 10, 1956. He arrived on the scene shortly thereafter and helped get Pablo to the hospital. He returned to the scene of the crime and found two empty shell casings, caliber .380. They corresponded to the live ammunition casings which were in the Beretta automatic pistol. All of the shells were marked the same way "Western .380 auto."

Sheriff Bill Graham of Lake County, on the early morning of April 11, 1956, went to Missoula with his undersheriff Schwarz, and returned defendant to the Lake County jail. Sheriff Graham testified:

"Q. Now, directing your attention to the evening of April 10, 1956, did you see the defendant, either that evening or during the early morning hours of the 11th of April, 1956? A. I seen him during the early hours of the 11th.

"Q. Would you tell us where you first saw him that day? A. I first seen him in the sheriff's office at Missoula.

"Q. Was he in custody? A. Yes, he was.

"Q. Did you as sheriff of Lake County, take possession of the defendant? A. I did.

"Q. What did you then do with him? A. Returned him to Polson.

"Q. Were you alone? A. I had my undersheriff Schwarz with me.

"Q. Who else was in the car? A. Laurence McLeod.

"Q. On the trip home and in your presence and in the presence of Mr. Schwarz did the defendant make any statement to you? A. He did.

"Q. What did he say? A. He first asked how Pablo was. I told him he was still alive. He said, 'That sure takes a lot off my mind'. He said, 'I didn't have anything against Pablo. Roullier is the one that should have been shot. He's the one that started all the trouble'.

"Q. Is that about the sum and substance of the conversation? A. That's about the size of it."

We have gone into the testimony and evidence at great length ▉ because of defendant's strenuous argument that the evidence was not sufficient to sustain the verdict. The court did not err in denying defendant's motion for a new trial for insufficiency of the evidence to sustain the verdict or the judgment.

Defendant assigns error in that the trial court overruled defendant's demurrer to the amended information and in overruling defendant's objection to the introduction of eviddence and his motion to dismiss the information. There is no merit in these contentions. The amended information complies with the requirements of R.C.M. 1947, sections 94-6401, 94-6403, 94-6404, 94-6405 and 94-6412.

Defendant next contends that the essence of the crime as ▉ charged, of assault in the first degree, is the intent to kill; that there was no evidence on behalf of the state, showing any threat against Pablo by the defendant, or his intention to shoot the gun in question and evidence of any trouble between them;

that there was no evidence that defendant wanted to hurt Pablo, nor did the state introduce any motive defendant might have had in the shooting; that for these reasons the prosecution should fail and the judgment of the district court should be reversed.

The record discloses abundant evidence to justify the verdict and to prove an intent to commit the crime with which the defendant is charged.

There have been volumes written on the statutory requirements of "Criminal Intent" as an element to be proved. In People v. Haxer, 144 Mich. 575, 108 N.W. 90, 91, the court said: "Intent is a mental attitude made known by acts."

The intent may be inferred from all the facts, the character of the assault, the use of a deadly weapon and that the natural, necessary and even probable consequences were intended.

The intent to do what is done with a free mind imports a criminal intent if the act is criminal. The act speaks for itself.

In criminal law "intent" means a state of mind which willingly consents to the act that is done, or free will choice, or volition in the doing of the act. It means the act is voluntary, that it proceeds from a mind free to act.

It has been said that the term "voluntary act" does not describe the mental element required in crime but describes the act. This however is academic quibbling in an effort, at times, to substitute some new term in place of an old well-established one, by calling attention to what, in the old phrase, is obviously a mere technicality in its verbal or grammatical construction.

The mental elements of different crimes differ widely, but all crimes where intent is a necessary element have one mental element in common, they must be voluntary, that is, must proceed from the will, from a mind free to act. It is in that sense that a criminal act may be properly said to be done with design, purpose or intent. The intent to do what is done imports a criminal intent if the act is criminal, and if this act is voluntarily done the intent to do the act is present, and it

constitutes a criminal intent. See Burdick, Law of Crime, vol. 1, section 113, page 126; Bishop's New Criminal Law, section 300, page 171, section 343, page 203.

It is the general rule in criminal cases that every presumption in favor of the defendant's innocence shall be indulged until the evidence establishes his guilt beyond a reasonable doubt.

Here the evidence is undisputed that the defendant shot Thomas Pablo twice, critically wounding him. The repeated shooting into the vital parts of the body of a live human being with a deadly weapon is evidence that the gun was used intentionally and deliberately and demonstrates the intent to kill. With this fact established the law presumes that the defendant was sane at the time he committed the act; that defendant committed the unlawful act with an unlawful intent, and that defendant intended the ordinary consequences of his voluntary act. R.C.M. 1947, section 93-1301-7, subds. 1, 2 and 3. These are rebuttable presumptions. However, as here where no evidence in explanation of, or reasons are given or presented for the unlawful act or acts, the jury may consider the same along with all other evidence in the case, and in passing on the guilt or innocence of the accused the jury must determine the intent, and the jury's conclusions must be considered as final on the issue, where as here the evidence is sufficient.

Defendant complains of the introduction of the gun, the clip and the cartridges therein, also the empty shell casings found at the scene of the shooting immediately thereafter.

It has been held repeatedly that it is relevant to show that after the commission of the crime, the defendant had a weapon of the same kind as that with which the crime had been committed as well as cartridges or shells which fitted the defendant's gun, or empty containers or shells of the same kind used in the commission of the crime, and that it is relevant for a witness to identify the weapon used as belonging to the defendant. See Wharton's Criminal Evidence, vol. 1, section 203, page 408, and

490

cases therein cited. There was no error in the admission of said exhibits.

The defendant predicates error on the court allowing additional names to be endorsed on the information. This contention is foreclosed by the decisions of this court. See State v. Schnepel, 23 Mont. 523, 59 Pac. 927; State v. McDonald, 51 Mont. 1, 149 Pac. 279; State v. Akers, 106 Mont. 43, 74 Pac. (2d) 1138; State v. Gaffney, 106 Mont. 310, 77 Pac. (2d) 398. Likewise defendant's contention that the court erred in refusing to vacate the setting of the trial has been by this court, under similar circumstances, decided adversely to defendant's contention. Compare State v. Showen, 60 Mont. 474, 199 Pac. 917; State v. Kocher, 112 Mont. 511, 119 Pac. (2d) 35.

We cannot say in this case that the court erred in refusing to grant defendant's motion for postponement or continuance over the term. The trial judge did not abuse his discretion in denying defendant's application for continuance under the facts in this case. The Constitution and statutes demand a speedy trial. Defendant had more than the statutory time in which to prepare for trial. R.C.M. 1947, section 94-7008.

Defendant contends that the court erred in refusing his motion to reduce bail which was initially set at $25,000. The Constitution provides that all persons shall be bailable by sufficient sureties, except for capital offenses, when the proof is evident or the presumption great. Mont. Const. Art. III, section 19; R.C.M. 1947, section 94-8506.

Section 20 of article III provides that excessive bail shall not be required, or cruel and unusual punishments inflicted.

The amount of bail which the judge may fix is within his sound legal discretion, and is always to be a reasonable amount. The trial judge in determining the amount of bail to be fixed, should take into consideration the enormity of the crime charged; the maximum penalty which the law authorizes; the pecuniary condition of the defendant; the probability of the defendant's flight to avoid punishment; his general character and reputation; the apparent nature and strength of the proof as bearing

upon the probability of his conviction; and any other matters bearing upon the particular case.

It should be kept in mind in this case that at the time bail was initially fixed, the person assaulted was in a very precarious condition. It was not known whether he would live or die and if he died the defendant would be subject to a charge of murder. The record discloses that as soon as the judge was advised that the person assaulted would probably live, he reduced the bail to $7,500 which in our opinion is a very reasonable amount under all the circumstances in this case.

The defendant may seek relief if and when bail is considered excessive by process for writ of habeas corpus. The trial judge did not abuse his discretion at the time of refusing to reduce the amount of bail under the circumstances at that time.

Defendant urges error in that the court imposed a sentence of imprisonment in the state prison for the term of eighteen years. This also was within the sound legal discretion of the trial judge.

The term fixed is within the statutory term for the offense of which the jury found the defendant guilty. It should be kept in mind that the defendant was charged in the same information with three prior felony convictions; that during the trial on the first day of the assault charge, the defendant pleaded guilty to the three prior felony convictions.

The judge committed no error in so fixing the penalty.

We call especial attention to the defendants contention that the court erred in refusing defendant's motion at the outset of the trial for the exclusion of the witnesses from the courtroom other than the witness on the stand.

There is no statute on the exclusion of witnesses at the trial in our Criminal Code. Yet, the Civil Code, R.C.M. 1947, section 93-1901-2, provides that: "If either party requires it, the judge may exclude from the courtroom any witness of the adverse party, not at the time under examination, so that he may not hear the testimony of other witnesses."

This section has been held to be applicable in criminal trials.

See State v. McDonald, 51 Mont. 1, 149 Pac. 279; State v. Johnson, 62 Mont. 503, 205 Pac. 661; State v. Walsh, 72 Mont. 110, 232 Pac. 194.

We are of the opinion that this is a salutary provision, especially in felony cases in the aid of a fair trial to which every defendant is entitled.

While section 93-1901-2, supra, leaves the question of excluding the witnesses to the sound legal discretion of the trial judge where no prejudice is shown, the judge's refusal to exclude will not be disturbed on appeal. See State v. Walsh, supra. However, this is the first time it has been brought to our notice that a judge has refused absolutely the exclusion rule, especially where as here the county attorney informed the court that he had no objection to the exclusion of the witnesses. The general rule announced in the great majority of jurisdictions follows the early English rule that exclusion from the courtroom, or "putting witnesses under the rule" as the procedure is termed, is a matter not of right, but is within the sound legal discretion on the part of the trial judge. However, the exclusion of witnesses in a felony case is seldom denied when properly and timely requested. In many felony cases where the trial judge has refused a timely request supported by particular reasons in behalf of defendant for the exclusion of witnesses, and where the record on appeal demonstrates that the denial of such request has been prejudicial to the defendant, the reviewing court has not hesitated in reversing and remanding the case for a new trial. 32 A.L.R. (2d) 358; 53 Am. Jur., Trial, section 31, page 46. Each case presents different situations, and in any exclusion order the trial judge need not exclude all the witnesses.

In this case the trial judge gave as his principal reason for not excluding the witnesses that, "In this case, to exclude somewhere between 25 and more witnesses; no place to exclude them to, except out here, standing up in this little lobby, where they can all talk together and talk with witnesses on the other side. It would be far more likely to prejudice the defendant than to have them right here in court, where we can watch them. So

the motion to exclude all, or exclude all witnesses not under examination, is denied.''

Under the facts in this case it is hard for us to understand the reason given by the trial judge as justifying his refusal of defendant's request for exclusion of witnesses. Surely the trial judge has excluded witnesses before in the same courthouse, and if the facilities furnished are not sufficient for the proper functioning of the court, it is his duty to see that such facilities are provided.

In any felony case, prejudice to the defendant may creep in because of the refusal of the trial judge on proper and timely application to exclude witnesses, and for that reason it is a dangerous procedure to refuse to put any of the witnesses under the rule of exclusion and thereby risk error. By the exclusion of witnesses, there is no denial of a defendant of his constitutional right to a public trial. Because of this assignment of error we have carefully examined all of the testimony of each of the many witnesses and we find that the state's witnesses each testified as individuals and some of the state's witnesses even disputed each other on some of the vital facts in the case, which demonstrated to our satisfaction that there was no evidence of any witness being under the influence of any other witness.

. There was no prejudice of the defendant shown herein arising from the refusal of the trial judge to apply the rule of exclusion of witnesses. We restate that in our opinion the better practice especially in felony cases is to apply the customary and universal rule of exclusion when proper and timely request, supported by particular and well founded reasons, is made.

We have examined all of the specifications of error raised by the defendant. We are satisfied that no injustice was done the defendant who was energetically and well represented by counsel in every phase of the case, and that defendant had a fair trial. There is no prejudicial or reversible error. The judgment and orders of the trial court appealed from are affirmed.

494

MR. CHIEF JUSTICE HARRISON, and MR. JUSTICES CASTLES, ANGSTMAN and ADAIR, concur.